Filed 8/9/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WATSON BOWMAN ACME CORPORATION, | F070067 |
| Plaintiff and Appellant, | (Super. Ct. No. CV002754) |
| v. | |
| RGW CONSTRUCTION, INC., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Ralls Gruber & Niece, John W. Ralls and W. Samuel Niece for Defendant and Appellant.

Lax & Stevens and Paul A. Lax; McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Plaintiff and Appellant.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.D and III of the Discussion.

# INTRODUCTION

RGW Construction, Inc. (RGW) was the successful low bidder on a California Department of Transportation (Caltrans) project for the construction of a Highway 99 overpass near Merced. RGW entered into a contract with Watson Bowman Acme Corp. (Watson) for the delivery of 146 sealed expansion joints for use on the overpass. Caltrans rejected Watson's two-cell expansion joint but subsequently approved Watson's larger, four-cell expansion joint for the project.

Watson and RGW disagreed on the compensation owed Watson for delivery of the four-cell expansion joints. Watson filed a breach of contract action, contending it was entitled to an adjustment of the price on RGW's original purchase order because the items ordered were changed. Watson argues that RGW's purchase order was ambiguous as to exactly what was ordered because the references to Caltrans's specifications were not consistent with the specific description that used the two-cell expansion joint's model number. Watson argues parol evidence showed it advised RGW that the two-cell expansion joint would not be approved by Caltrans and, despite this warning, RGW specifically requested a quote from Watson for the less expensive two-cell model. Thus, Watson argues that its subsequent delivery of a four-cell expansion joint to satisfy Caltrans's specifications should be regarded as a change order that entitles it to an adjustment of the contract price. RGW disagrees, arguing that the price quoted for the two-cell expansion joint was the applicable price because the purchase order, which Watson signed, unambiguously stated the expansions joints would conform to all of Caltrans's specifications.

The trial court concluded that RGW's purchase order was ambiguous and allowed the jury to decide what the contract meant and what price was appropriate. The jury decided in favor of Watson, finding the amount of the subject agreement was $605,990.

After deductions for the amounts RGW previously paid on the contract and the amount owed RGW on its cross-complaint, the jury awarded Watson damages of $383,032.

On appeal, RGW contends its purchase order unambiguously included Watson's warranty that the proposed expansion joints would conform to Caltrans's specifications and, based on the unambiguous contract language, this court can reverse the jury's verdict and direct the entry of judgment in favor of RGW. In its cross-appeal, Watson contends the trial court erroneously denied its request for prejudgment interest under Civil Code section 3287.

We conclude the trial court correctly (1) determined that RGW's purchase order was ambiguous and (2) allowed the jury to evaluate the conflicting parol evidence before deciding the meaning of the contract. We further conclude that the price adjustment owed to Watson for the change in the order was sufficiently certain to meet the statutory requirements for an award of prejudgment interest.

We therefore affirm the judgment, except for its failure to award prejudgment interest to Watson.

**FACTS**

*Parties*

Plaintiff Watson designs, manufactures and supplies expansion joint components to the construction industry. Watson is owned by BASF Corporation.

Defendant RGW is a general contractor licensed by the State of California. About 90 percent of RGW's work is on public contracts. Robert Purdy, one of the principals of RGW, testified RGW had built more bridges than he could count and estimated the total volume at over $1.5 billion.

Caltrans is not a party to this litigation. It is an agency of the State of California that contracts for the construction of highways and related structures. In 2009, Caltrans presented to the public for competitive bidding a project located in Merced County and referred to as the Route 99 Undercrossing to Black Rascal Canal Bridge. Caltrans

3.

selected RGW as the qualified firm with the lowest, complete bid for the project. The contract between Caltrans and RGW was designated "Contract No. 10-0K0204."

The trial court described the relationship among Watson, RGW and Caltrans by telling the jury that Caltrans was the owner of the project, RGW was the prime contractor, and Watson was a supplier to RGW.

*Bid Documents*

The notice to bidders issued by Caltrans consisted of four layers of documents: (1) the "STANDARD SPECIFICATIONS" issued by Caltrans in July 1999; (2) the standard plans dated 2004; (3) the project plans approved March 9, 2009; and (4) the bid book dated July 13, 2009. Section 51 of the Standard Specifications addressed concrete structures and stated that joints must be constructed in conformance with (1) the requirements of that section's provision addressing expansion joints and (2) the details shown on the plans. Pursuant to section 51 of the Standard Specifications, joints in concrete structures shall be sealed with "joint seals" or "joint seal assemblies." Joint seal assemblies have a higher movement rating (over 50 mm) than the various types of joint seals. Joint seal assemblies shall consist of metal or metal and elastomeric assemblies that are anchored or cast into a recess in the concrete over the joint. A joint sealed by an assembly must resist the intrusion of foreign material and water and must provide traffic with a bump free passage. Pursuant to section 51-1.12F(3)(c) of the Standard Specifications, joint seal assemblies "shall be furnished and installed in joints in bridge decks as shown on the plans and as specified in the special provisions."

On August 28, 2009, Caltrans issued "Addendum No. 2" for the project, which revised certain special provisions, including the special provision in section 10-1.57 for the joint seal assemblies. The addendum also revised the "Bid Item List" in the bid book

to include "Item 133," which was described as "JOINT SEAL ASSEMBLY (MR 101 MM - 160 MM)."[1]

Revised section 10-1.57 of the special provisions was a page and a half long and required the contractor to submit complete working drawings for each joint seal assembly to the Offices of Structure Design in conformance with the provisions of the Standard Specifications addressing plans and working drawings. "The Contractor shall allow [Caltrans's] Engineer 28 days to review the drawings after a complete set has been received." After final working drawing approval, the contractor was required to provide a set of corrected prints of all working drawings to Caltrans's engineer.

*Watson's September Quotation*

September 23, 2009, was bid day for the project. Watson sent RGW its quotation number 092698-02 for 146 units described as "JOINT SEAL ASSEMBLY (MR 101-106MM) [¶] WaboModular BET-1200 Strip Seal" at a unit price of $3,940, with estimated shipping and handling of $29,750 and one day of field service at $1,000 (Quote 02). Quote 02's total quote price was $605,990.

The second page of Quote 02 identified items or services included in the price and stated curb cover plates were excluded from the price. That page also stated: "Documents utilized to develop this quote: [¶] - plans and specs with addenda 1-4."

*Phone Discussions*

In early October 2009, Caltrans awarded the contract to RGW, the low bidder. When Paul Biesinger, Watson's sales manager for the region that included California, learned RGW was the successful bidder, he contacted RGW to see if Watson would be selected to furnish joint seal assemblies for the project. Biesinger was directed to John Pitsch, a grading and paving estimator for RGW.

---

[1] Item 133 replaced Item 81, which had described a joint seal assembly with a movement rating of 100 millimeters. Initially, Watson submitted a quote on Item 81 that proposed delivering its "WaboStripSeal Type R" at a price of $238 per unit.

During the telephone conversation between Pitsch and Biesinger, Pitsch said that Watson's quote was very high or about twice the low number submitted. Biesinger tried to get more information from Pitsch about who the competitors were and what numbers they quoted, but Pitsch would not provide specific information. Biesinger thought the other quotes might be low because a skew angle was involved, which changes Caltrans's interpretation of the width of the joint's gap, and the competition might not have been aware of that fact. Skew refers to the angle of the joint seal assemblies in relation to the direction of vehicle travel. Biesinger described skew using a comparison to the hypotenuse of a right triangle. Measuring the gap created by a joint using a hypotenuse (i.e., a diagonal line across the gap) will yield a larger dimension than measuring straight across the gap. Biesinger testified that Caltrans treats the size of a joint as being bigger when the angle is skewed. Biesinger stated that he had been involved in jobs with one degree of skew and that small amount of skew was enough for Caltrans to change the size of the joint seal system. For this project, the skew angle was 61 degrees.[2]

Biesinger tried to explain skew to Pitsch and raised the possibility that the competitors were quoting a system that would be too small. Biesinger stated that Pitsch did not seem to understand the issue and did not want to listen to Biesinger's explanation, despite Biesinger's many past experiences with the issue.

Biesinger testified that Pitsch requested another "quote based on the description of the joint alone without skew angle involved, without the spec involved." In this context, "description" referred to the joint's movement rating of 101 to 160 millimeters—roughly 4 to 6 inches. Biesinger testified that he then made a further attempt to explain skew and that a joint based on the bid item description would not be approved by Caltrans. Biesinger testified that Pitsch asked specifically for a quote based on the bid item—that

---

[2]     Watson contends that Caltrans addendum No. 2 modified the requirements for the joint seal assemblies by showing that they were to be installed at a 61-degree angle across the roadway rather than perpendicular to the direction of travel.

is, based on the movement rating. Biesinger testified, "I gave him what he wanted. I went to my boss, asked for permission, explained the situation to him, which I've done many times." Biesinger's boss gave him permission to submit another quote.

Pitsch's testimony provided a different version of the telephone conversation with Biesinger. Pitsch stated that, as a result of the conversation, he expected that Biesinger might submit a new quote for the joint seal assemblies. Pitsch did not expect Watson to submit a new quote for products that would not meet all the plans and specifications. Instead, he thought Watson would submit a quote for a joint seal assembly that would be accepted by Caltrans.

*Watson's November Quotation*

On November 12, 2009, Watson sent RGW a new quotation numbered 092598-06 (Quote 06). The quote offered to furnish 146 units of "JOINT SEAL ASSEMBLY (MR 101-106MM) [¶] WaboModular STM600 w/ bulkhead plates" at a price of $1,304 per unit, with an estimated shipping and handling charge of $15,867 and one day of field service at $1,000. The first paragraph of text in quotation began:

> "We are pleased to submit this quotation for your acceptance. Any contract arising from this quotation shall be expressly limited to the WBA terms and conditions of sale available upon request or by visiting our website at www.wbacorp.com. Your acceptance of this quotation shall be deemed an acceptance of these terms and conditions unless otherwise expressly consented to in writing by Watson." (Some capitalization omitted.)

The second page of Quote 06 tracked language in Quote 02 by stating: "Documents utilized to develop this quote: [¶] - plans and specs with addenda 1-4." The last page of Quote 06 included a signature block below a line stating "I have read and agree to all the terms of this agreement." The paragraph below the signature block, stated in part:

> "[Watson] MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES OF ANY KIND, EITHER EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF

7.

MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE with respect thereto, including, but not limited to, any inaccuracy or ambiguity, or any results to be obtained therefrom."

Biesinger faxed Quote 06 to Pitsch and spoke with him by telephone. Pitsch told Biesinger he was not the one making the decisions on who RGW would use for expansion joints and told Biesinger to deal with David Aboujudom from that point on. Aboujudom, an estimating manager at RGW and a registered civil engineer, was Pitsch's superior. When Biesinger spoke with Aboujudom, Aboujudom had both Watson's Quote 02 for the four-cell system and Quote 06 for the two-cell system. Biesinger testified, "I started over again with the fact that I did not feel that that two-cell system would be approved. [¶] And he was in the same mindset as John Pitsch was. He just wanted movement rating alone. He didn't seem to understand the skew angle part of it changing the size of the system."

Biesinger testified that he spoke with Aboujudom twice and explained both times about the skew angle, the difference between the two products quoted, and his expectation that Caltrans would not approve a two-cell joint. He stated that Aboujudom's response was to still want the quote based on the joint movement rating without considering the skew. We note that Aboujudom's approach may have been rational: Biesinger testified that his experience on Caltrans's projects included situations where a contractor took a joint that Biesinger did not believe would meet the specifications and, nevertheless, it was accepted by Caltrans. Thus, Aboujudom may have decided to run the two-cell model by Caltrans on the chance it might be approved, which would have saved RGW almost $400,000.

Aboujudom testified about the telephone conversations with Biesinger. When asked if he understood that Watson's quote would not meet all of the plans and specifications, Aboujudom answered, "No. Absolutely not." Aboujudom also testified that he did not ask Biesinger why there was a $400,000 difference between Quote 02 and

8.

Quote 06 and that he did not recall discussing with Biesinger the skew involved in the design of the project.

*RGW's Purchase Order*

On November 15, 2009, Aboujudom signed a three-page purchase order (trial exhibit 412). Pitsch sent two original purchase orders to Biesinger, asking him to sign, initial and return one original while retaining the other for Watson's files. The purchase order stated that Watson, as seller, agreed to deliver 146 units of "Joint Seal Assembly (MR 101-106mm)" for a unit price of $1,304. The total amount of the purchase order, $222,957.68, including shipping, handling, field service and Merced County tax of 8.25 percent. Underneath the foregoing information, the purchase order included the following:

> "*Quote Number/Price confirmation Number – 092598-06*
>
> "*Shop drawings to be approved prior to fabrication.*
>
> "*Wabco Modular STM600 w/bulkhead plates*
>
> "*Price firm for delivery up to 6 months from quote date*" (Italics in original.)

The foregoing language, along with the line "*Per Plans and specifications with addenda 1-4*," contained in Quote 06, is relevant to the interpretation of the contract formed by the parties and the dispute over what precisely Watson agreed to provide—a particular model number (STM600) or a product that complied with Caltrans's specifications.

The first page of the purchase order contained signature blocks at the bottom and, immediately above the signature blocks, the following paragraph:

> "Acceptance copy must be signed and returned immediately. Seller by signing this order, by acknowledging the order or by delivering purchases described above, warrants that seller has read and agrees to the terms and conditions on the face of and attached to this order; that seller has read and is familiar with the *contract documents described above or otherwise*

9.

*incorporated herein* as fully as if written herein; and that all purchases hereunder will be and are furnished in accordance with the terms of this order, the contract documents and seller's samples (if any) approved by the contractor." (Some capitalization omitted and italics added.)

Provisions on the second and third page of the purchase order that are relevant to interpreting the parties' contract are in paragraphs numbered 8, 16, 17, 21 and 24. The text of those provisions is set forth in the parts of this opinion analyzing their meaning.

On December 18, 2009, Watson's controller, Michael Turchiarelli, countersigned and dated the purchase order. Watson contends the signed purchase order was returned to RGW with Watson's "Terms and Conditions of Sale" attached. Watson also contends its terms and conditions of sale became part of the contract because the purchase order incorporated Quote 06 and Quote 06 referred Watson's terms and conditions of sale and expressly disclaimed warranties of fitness for a particular purpose and warranties of merchantability.

*Caltrans's Rejection of Two-Cell Model*

After the purchase order was signed, Watson prepared shop drawings for submission to Caltrans for approval. In February 2010, Caltrans sent RGW a letter rejecting the shop drawings for the joint seal assembly and marking its reasons on the returned drawings. Those reasons referred to a maximum width, measured in the direction of vehicular traffic, of 75 millimeters and stated the submission was not adequate.

On March 1, 2010, RGW returned the rejected drawings to Watson with a cover letter directing Watson to revise and resubmit. In RGW's view, it simply was asking Watson to comply with the contract and submit drawings for a product that would satisfy Caltrans's specifications. In contrast, Watson now views the correspondence as written directions to provide a product different from the one described in the purchase order—in essence, a change order under paragraph 16 of the purchase order (see fn. 13, *post* [text of paragraph 16]).

10.

In response to RGW's direction, Watson resubmitted drawings for the four-cell system described in Quote 02. RGW presented the new drawings to Caltrans and the four-cell system was approved.

In September 2010, Watson resubmitted its Quote 02 and requested a change to the purchase order to reflect the original price in Quote 02 of $605,990. Eventually Watson manufactured four-cell joint seal assemblies for the project per the specifications contained in Quote 2.

In May 2011, Watson again informed RGW that Watson needed a change order before it would ship the joint seal assemblies. RGW responded with a letter stating that it expected delivery of the assemblies on or about June 1, 2011, at the executed purchase order price of $207,251. Watson did not deliver the assemblies and, on June 2, 2011, a law firm representing RGW sent Watson a letter stating: "If W[atson] continues to maintain that it is entitled to additional money for providing these joint seal assemblies, then W[atson's] claim should be arbitrated pursuant to Purchase Order Term and Condition No. 16. As stated therein, W[atson] 'shall not delay performance pending determination of the amount of such an adjustment.'"

Watson's reply letter, dated June 8, 2011, stated its legal counsel had advised shipping the assemblies based on the express understanding the RGW would tender the amount of $222,957.68 to its lawyer's trust account and that amount would be payable to Watson unconditionally upon RGW's receipt of the first shipment of assemblies. The letter also stated that Watson was rescinding prior settlement offers and intended to pursue payment in full. In accordance with its letter, Watson shipped half of the assemblies in June 2011 and the rest in August 2011. There were some problems with the assemblies that resulted in project delays and repair costs, which RGW addressed in its cross-complaint.

**PROCEDURAL HISTORY**

*Pleadings*

11.

In June 2012, Watson filed a complaint against RGW, Caltrans and an unnamed surety company. In October 2012, Watson filed a first amended complaint, which is the operative complaint in this litigation. Watson asserted causes of action against RGW for breach of contract and unjust enrichment.

Watson's breach of contract cause of action alleged that RGW revised its order by changing the joint seal assemblies for the project from the Model STM600 referred to in Quote 06—a quote that RGW requested—to the Model BET 1200 that Watson previously offered in Quote 02. Watson alleged RGW refused to pay the price of $605,990 quoted by Watson for the Model BET 1200 joint seal assemblies or any amount in excess of the $207,251 price quoted for the Model STM600 joint seal assemblies. Watson alleged it was damaged in the amount of $605,990 as a result of RGW refusal to pay.

Watson's unjust enrichment cause of action alleged it provided 146 units of the Model BET 1200 joint seal assemblies based on the reasonable belief that RGW had agreed to the quoted price of $605,990. Watson also alleged that RGW received a benefit from and was enriched by the assemblies provided by Watson and from withholding Watson's compensation for the assemblies. Watson estimated the benefit RGW received was no less than $605,990.

RGW's answer to Watson's first amended complaint denied liability. Also, RGW filed a cross-complaint alleging that Watson breached its obligations under the purchase order by delivering defective joint seal assemblies, which caused $134,810 in damages.

*Jury Trial*

The jury trial was held in April 2014. The special verdict form's sole question about Watson's complaint against RGW asked, "What was the amount of the subject agreement?" The jury found the amount was $605,990. On RGW's cross-complaint, the jury found that the joint seal assemblies furnished by Watson were defective and that

RGW suffered $111,771.08 in damages as a result of those defects.[3]  Based on these figures and the parties' stipulation that RGW previously paid Watson $111,186.60,[4] the jury determined the net amount owed by RGW to Watson was $383.032.32.

RGW challenged the jury's verdict by filing a motion for judgment notwithstanding the verdict, or alternatively for a new trial.  In June 2014, the court heard RGW's motions and Watson submitted a request to include prejudgment interest of over $136,000 in the final award.

In August 2014, the trial court issued two written orders.  First, the court denied Watson's request for prejudgment interest, stating it was untimely because Watson had not made a motion prior to the entry of judgment or, alternatively, in the form of a motion for new trial.  Second, the court denied RGW's motion for judgment notwithstanding the verdict and its motion for a new trial.

Later in August, RGW filed a notice of appeal from the judgment and the order denying its motion for judgment notwithstanding the verdict.  Watson filed a notice of cross-appeal, challenging the denial of prejudgment interest and protecting itself on certain adverse evidentiary rulings made during the trial.

---

[3]     The jury's resolution of the claims raised in RGW's cross-complaint are not challenged in the appeal or cross-appeal.  Accordingly, the facts relevant to those claims are not described in this opinion.

[4]     RGW made two payments to Watson.  The first was for $88,147.  The second, made in November 2013, was for $23,039.60.  The payments were intended to cover the difference between the price listed in the purchase order and RGW's damages for the cost of repairs and 16 days of delay.

**DISCUSSION**

I.     BREACH OF CONTRACT[*]

    A.     <u>Contract Formation by Offer and Acceptance</u>

        *1.     Basic Rules*

Mutual assent or consent is necessary to form a contract. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141; Civ. Code, § 1550, 1565.) The outward manifestation of contracting parties' mutual consent often is accomplished through the process of offer and acceptance. (*Codemasters*, *supra*, at p. 141; Rest.2d Contracts, § 22.) The process of offer and acceptance was used by Watson and RGW to form the contract involved in this appeal.

Generally, the party receiving an offer may accept that offer and form a contract or, alternatively, may reject the offer. (Rest.2d Contracts, §§ 38 [rejection], 50 [acceptance].) In certain situations, an offer is rejected and can no longer be accepted when the other party makes a counter-offer. (Rest.2d Contracts, § 39 [counter-offers]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 163, p. 200.)

        *2.     Watson's Offers*

The partially preprinted document Watson used for its quotations included a box at the bottom of the first page with signature lines for both the buyer and Watson. Immediately above the buyer's signature line, the form stated: "The above proposal is accepted." None of Watson's quotations were signed by RGW. Thus, the offers contained in Watson's quotations were not accepted by RGW.[5]

---

[*]     See footnote, *ante,* page 1.

[5]     The fact Watson's offers were not accepted leaves open the question of whether some or all of the terms of Watson's offers were incorporated by reference into a subsequently formed contract. (See I.C.4, *post*.)

### 3. *RGW's Purchase Order*

RGW's purchase order dated November 12, 2009, contained a signature block at the bottom of the first page. Aboujudom signed the purchase order on behalf of RGW and dated his signature November 15, 2009. The purchase order was countersigned by Watson's controller, Michael Turchiarelli, and his signature was dated December 18, 2009. A few handwritten changes were made to the purchase order. For example, the price for shipping and handling was noted as "estimated" and the delivery terms were changed from F.O.B. the project site to F.O.B. origin.[6]

Under the basic rules of contract law governing offer and acceptance as a method of contract formation, Watson and RGW formed a contract when Watson accepted RGW's offer by signing the purchase order.

### B. Rules Governing Contractual Interpretation

### 1. *Ambiguity and Parol Evidence*

Under California law, the steps a trial court must follow in determining the meaning of a written contract are well established, as are the applicable standards of appellate review. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166.) The threshold question for trial and appellate courts is whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation. (*Winet v. Price*, *supra*, at p. 1165; *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754-755.) Whether a contract is ambiguous presents a question of law subject to independent review on appeal. (*Smith v. Adventist Health System/West*, *supra*, at p. 755.)

---

[6] F.O.B. means free on board at the named place. (Cal. U. Com. Code, § 2319, subd. (1).) When goods are sold F.O.B. the place of shipment, the seller bears the expense and risk of putting the goods into the possession of the carrier and the buyer bears the expense and risk of transport. (Cal. U. Com. Code, § 2319, subd. (1)(a).)

An appellate review of contractual ambiguity centers upon the words used by the parties to form their contract, but also considers any proffered parol evidence relevant[7] to proving what those words meant to the parties. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37; *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.) The analysis of any proffered parol evidence begins with the trial court provisionally receiving (without actually admitting) the evidence. (*Ibid*.) The parol evidence might expose a latent ambiguity when the contract appears unambiguous on its face. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, *supra*, at p. 40 & fn. 8.) When the parol evidence renders the contractual language reasonably susceptible to the interpretation urged, the evidence is admitted to aid the interpretation of the contract. (*Winet v. Price*, *supra*, at p. 1165.)

A restriction on the admission of parol evidence applies to written contracts that are integrated—that is, are intended by the parties to be the final expression of their intent. (Code Civ. Proc., § 1856, subd. (a); Cal. U. Com. Code, § 2202; *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 14.) The terms of an integrated agreement may not be *contradicted* by parol evidence. (*Ibid*.) Thus, parol evidence is admissible to show what the parties meant by what they said in an integrated agreement, but is inadmissible to show the parties meant something other than what they said. (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2015) ¶ 8:3105, p. 8E-322.)

2. *Resolution of the Ambiguity and the Role of Parol Evidence*

Once a trial or appellate court determines there is no ambiguity—that is, the language is reasonably susceptible to only one interpretation—the judicial inquiry into

---

[7]    Evidence is relevant if it concerns a party's outward manifestation or expression of intent. (*Winet v. Price*, *supra*, 4 Cal.App.4th at pp. 1165-1166.) In contrast, "evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." (*Id*. at p. 1166, fn. 3.)

meaning has been completed and the one reasonable interpretation applies to the facts. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; Civ. Code, § 1638.)

If an ambiguity exists, the court must determine whether the *resolution* of that ambiguity presents a question of law or, alternatively, one or more questions of fact. The former is decided by the court, the latter by the trier of fact. Whether there is a triable issue of fact depends on whether the parties have presented conflicting parol evidence relevant to the meaning of the ambiguous language. When the parol evidence is not in conflict, the resolution of the ambiguity is a question of law and is subject to independent review on appeal. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351.) This rule applies even where conflicting inferences may be drawn from the uncontroverted evidence. In such a situation, our Supreme Court regards the choice among the conflicting inferences as solely a judicial function, not a choice to be made by a jury. (E.g., *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

In contrast, when the parol evidence is in conflict, the trier of fact must resolve that conflict by making findings and, as a result, the ultimate interpretation of the ambiguous language involves questions of fact. (*Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351.) When an appellate court is presented with a case in which the parol evidence is in conflict, "any reasonable construction will be upheld as long as it is supported by substantial evidence. [Citation.]" (*Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1166.)

Regardless of whether the ambiguity is resolved as a judicial function or by a trier of fact, Civil Code section 1649 provides that the ambiguity "must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Despite the reference to the promisor's belief and the promisee's understanding, this provision protects the *objectively reasonable* expectations of the promisee. (*Bank of the West v. Superior Court*, *supra*, 2 Cal.4th at p. 1265.)

17.

C.       Interpreting "Contract Documents"

1.      *Language in the Purchase Order*

The parties disagree about the meaning of language included on the first page of the purchase order in the paragraph immediately above the signature blocks. The language states that Watson "has read and is familiar with *the contract documents described above* or otherwise incorporated herein as fully as if written herein; and that all purchases hereunder will be and are furnished in accordance with the terms of this order, the *contract documents* and seller's samples (if any) approved by the [RGW]." (Capitalization omitted, italics added.)

Watson contends the "contract documents" include Quote 06 and, therefore, Quote 06 was incorporated into the purchase order and became part of the contract. RGW disagrees, arguing that "the 'contract documents' refers to Caltrans' plans and specifications, which are referenced in multiple places in the Purchase Order."

The dispute over which pieces of paper are part of the written contract requires us to determine the meaning of the phrases "contract documents," "described above," or "otherwise incorporated herein as fully as if written herein." The parties did not offer parol evidence relevant to the meaning of these phrases. Consequently, interpreting them, either separately or together, is a judicial function and subject to independent review on appeal. (*Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351.)

2.      *"Documents Described Above"*

First, we conclude the phrase "documents described above" is not ambiguous. Neither party has addressed its meaning and, as a result, conflicting interpretations have not been presented.

Second, "describe" means "to represent by words written or spoken for the knowledge or understanding of others." (Webster's 3d New Internat. Dict. (1993) p. 610.) "Above" means "something that is located, written, or discussed higher on the same page or on a preceding page." (*Id*. at p. 5.) "Document" means "[s]omething

18.

tangible on which words, symbols, or marks are recorded." (Black's Law Dict. (9th ed. 2009) p. 555.) Most traditionally, of course, the term embraced any piece of paper with information on it.

Therefore, we conclude the phrase "documents described above" appearing on the first page of the purchase order means pieces of paper that are represented by words written higher on the first page of the purchase order.

Applying this definition to the facts of this case, we conclude the words "*Quote Number/Price confirmation Number – 092598-06*" are words written higher on the first page of the purchase order and those words describe a document—namely, Quote 06. Therefore, Quote 06 is among the "documents described above" as that phrase is used in the purchase order.

### 3.     *"Contract Document"*

While impliedly conceding that Quote 06 is a "document" and is "described above," RGW contends that Quote 06 is not a "contract" document as that term is used in the purchase order. In RGW's view, language in paragraphs 21 and 24 of the purchase order unequivocally demonstrate the parties' intention not to have Quote 06 be part of their agreement.

Paragraph 21 of the purchase order states: "The terms and conditions of sale as stated in this order govern in event of conflict with any terms of Seller's proposal …." Paragraph 24 of the purchase order states: "Any prior or subsequent writing adding to, altering, or modifying any of the terms and conditions of this agreement shall not be considered as a part of this purchase order unless expressly recognized in writing on this Purchase Order or by Separate document." We conclude that these provisions of the purchase order support the inference that the parties intended that Quote 06 submitted by Watson be part of the overall contract between the parties.

19.

First, paragraph 21 would not be necessary if the seller's quote or proposal was not part of the overall contract, because a conflict in terms would be of no consequence. A conflict between a provision of the contract and a provision in a document that is not part of the contract would be insignificant because the provision in the contract controls over language in a document that is not part of the contract.[8] In contrast, if the seller's quote or proposal was a part of the contract, there is a possibility that the terms in the various documents would conflict and a provision stating which document controlled would be useful.

Second, paragraph 24 begs the questions of what are "the terms and conditions of *this agreement*." (Italics added.) The phrase "this agreement" unambiguously includes more than just the purchase order because the sentence subsequently refers to the "Purchase Order" and to "Separate document." More importantly, paragraph 24 contains an exception for certain prior writings—specifically, those writings "expressly recognized in writing on this Purchase Order." The language in the exception applies to Quote 06 because of the inclusion of the words "*Quote Number/Price confirmation Number – 092598-06*" on the first page of the purchase order. As a result, Quote 06 was "expressly recognized in writing on this Purchase Order" and the exception in paragraph 24 applied to Quote 06 such that it is "a part of this purchase order" and part of "this agreement."

In summary, (1) the term "contract document" is ambiguous and (2) we resolve that ambiguity by concluding Quote 06 is among the "contract documents described above" as that phrase is used in the purchase order. RGW's next argument is that none of the terms of Quote 06 were incorporated into the purchase order.

---

[8]    Whether Quote 06 is *part of the contract* formed by the execution of the purchase order is a question different from how to resolve conflicts between language in Quote 06 and language in the purchase order (or other contract documents).

### 4. *"Otherwise Incorporated Herein"*[9]

RGW argues that the purchase order's reference to Quote 06 "is very weak, as follows: 'Quote Number/Price confirmation Number – 092598-06.' There are no other words to suggest an intent to incorporate any terms from (much less incorporate a document that was in turn referenced in) that quotation. There is in fact every indication that this was not the parties' intent." We disagree.

The purchase order refers to "the contract documents described above *or otherwise incorporated herein* as fully as if written herein." (Capitalization omitted and italics added.) "Otherwise" means "in a different way or manner." (Webster's 3d New Internat. Dict., *supra*, p. 1598.) The use of "otherwise" in the phrase "or otherwise incorporated herein" suggests that a way for incorporating a document into the purchase order is described immediately before the phrase "or otherwise incorporated herein." Incorporation by that method occurs when a "contract document[ is] described above."[10] The purchase order's language about incorporation is not ambiguous. The only objectively reasonable interpretation of the language is that Quote 06 was incorporated into the contract formed when the purchase order was executed. Stated another way, an objectively reasonable person signing the purchase order would expect that Quote 06, which had been described earlier in the purchase order, was a contract document incorporated into the agreement. (See *Bank of the West v. Superior Court*, *supra*, 2 Cal.4th at p. 1265; Civ. Code, § 1649.)

---

**9** Incorporation by reference means the inclusion within a body of a document of text that, although physically separate from the document, becomes as much a part of the document as if it had been typed directly into the document. (*Pine Terrace Apartments, L.P. v. Windscape, LLC* (2009) 170 Cal.App.4th 1, 16; see Black's Law Dict., *supra*, pp. 834-835 [definition of incorporation by reference].)

**10** Counsel for Watson adopted this interpretation during his closing argument to the jury. He succinctly stated, "You don't put 'otherwise incorporated' unless the documents above are incorporated."

In summary, RGW is responsible for the objectively reasonable expectation created by (1) RGW's decision to type "*Quote Number/Price confirmation Number – 092598-06*" onto the first page of the purchase order and (2) the subsequent preprinted provision referring to "the contract documents described above or otherwise incorporated herein as fully as if written herein." (Capitalization omitted.) (See Civ. Code, § 1654 [contract construed against the party causing the uncertainty]; *Mills v. Hunter* (1951) 103 Cal.App.2d 352, 357-358 [printed contracts must be interpreted most strongly against the party preparing the form].) The terms of Quote 06 were incorporated into the purchase order.

D.      Interpreting and Applying "Items Ordered by Specifications"

1.      *Paragraph 8 of the Purchase Order*

The parties explicitly disagree about how the language in paragraph 8 of the purchase order should be applied to the facts of this case. The provision reads:

> "8. Seller expressly warrants that all items ordered by specifications will conform thereto and the drawings, samples or other description furnished or adopted by the Buyer, or, if not ordered to specifications, will be suitable for the purpose intended and that all articles will be of good material and workmanship, and free from defect. The foregoing are in addition to all other warranties either expressed or implied."

The questions presented by this provision are (1) whether the joint seal assemblies that RGW ordered from Watson by the purchase order were "items ordered by specifications" and (2) if so, what were the exact specifications agreed upon by the parties.

2.      *Contentions of the Parties*

RGW contends that the joint seal assemblies were "ordered by specifications" and the applicable specifications were contained in Caltrans's plans and specifications for the project. Thus, in RGW's view, Watson expressly warranted that the joint seal assemblies

described in the purchase order would meet Caltrans's requirements and, thus, would be approved for the project.

Watson begins by contending that the evidence supports a finding that the joint seal assemblies were *not* ordered to specifications. This argument is an overstatement because (1) Watson's own documents stated "plans and specs with addenda 1-4" were among the documents used to develop Watson's quotes and (2) certain dimensions of the joint seal assemblies, such as the length and skew, had to come from Caltrans's specifications.

Watson also contends the assemblies were ordered based on only part of the plans and specifications. Thus, Watson contends that some, but not all, of Caltrans's specifications for joint seal assemblies applied to the items ordered by RGW. Watson believes that certain of Caltrans's specifications for joint seal assemblies were replaced or superseded by the parties' agreement, which included the purchase order's specific reference to "*Wabco Modular STM600 w/bulkhead plates*" (italics added) and the incorporated Quote 06.

### 3. *Caltrans's Specifications*

The term "by specifications" used in paragraph 8 of the purchase order is not ambiguous as to *the source* of the "specifications." Caltrans, as the owner of the project, is the entity that issued the relevant specifications. This interpretation is consistent with the use of the word "specifications" on the first page of the purchase order in the phrase "Per Plans and specifications with addenda 1-4 noted" and the use of the phrase "plans and specs with addenda 1-4" in Quote 02 and Quote 06. There is no dispute that Caltrans issued the specifications and the addenda. Accordingly, our analysis proceeds based on the interpretation that "specifications" refers to requirements established by Caltrans.

The warranty provision in paragraph 8 of the purchase order stated that the seller "warrants that all items ordered by specifications will conform thereto." This language is general in nature and does not identify the particular specifications by which the item was ordered. For instance, the provision does not state that items ordered by specifications must conform to *all* of the owner's specifications for that item. Therefore, we conclude that the wording "ordered by specifications" does not explicitly identify the specifications by which the item was ordered. Consequently, we turn to other provisions in the purchase order to see if they clarify whether some or all of Caltrans's specifications applied to the assemblies that were ordered.

RGW argues that the general language in paragraph 8 is explained by language in paragraph 17 of the purchase order, which uses the word "all" in reference to Caltrans's specifications:

> "A. This Purchase Order is issued in performance of *Contract No. 10-0K0204* dated between [RGW] and Caltrans as Owner. [Watson] is bound to [RGW] by the terms of said Contract and *the Plans and Specifications* there under, and *shall conform to* and comply with *all* the terms thereof and shall assume toward [RGW] all the duties and obligations that [RGW] has assumed toward [Caltrans] (unless expressly changed by this Purchase Order), insofar as they are applicable to the item purchase[d] hereunder." (Italics added.)

This provision clearly refers to Caltrans's contract with RGW and the plans and the specifications issued pursuant to that contract. Furthermore, the provision states that Watson shall conform to "all the terms" of that contract and Caltrans's plans and specifications. As a result, the language at the beginning of paragraph 17.A of the purchase order unambiguously states that *all* of the specifications issued by Caltrans for joint seal assemblies apply to the assemblies ordered by RGW.

However, our inquiry—like paragraph 17.A itself—does not end with the phrase "all the terms thereof." Paragraph 17.A continues and sets forth two exceptions. First, a

parenthetical directs that all of the terms of the specifications, plans and Caltrans contract apply "unless expressly changed by this Purchase Order." Second, Watson was required to conform to all terms of the specifications "insofar as they are applicable to the item purchase[d] hereunder."

These exceptions create the possibility of ambiguity. It may be that paragraph 17.A's general rule controls and, therefore, all of the terms in Caltrans's specifications applied to the parties' transaction. Alternatively, one of the exceptions might apply and thereby render some of the specifications inapplicable. Our inquiry into contractual ambiguity is concerned primarily with the first exception and whether the terms of Caltrans's specifications were "expressly changed by this Purchase Order."

We conclude the exception's use of the phrase "expressly changed" creates an ambiguity because a change could be implemented or expressed in different ways. First, an express change could be described from the perspective of the product to be delivered. The product described could be inconsistent with a specification, thus making it impossible for the seller to (1) deliver that particular product and (2) conform with all specifications. In such a case, the description of the product in the purchase order could be viewed as expressly changing or superseding the inconsistent specification, provided that the parties knew or suspected that product would not conform to a specification. Second, a change could be expressed in language that refers to a particular specification and identifies how it is modified. For example, the parties could state that specification No. 1.5 is changed from X to Y. Therefore, we conclude the phrase "expressly changed" in the first exception stated in paragraph 17.A is ambiguous because there are at least two ways the change could be expressed. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389 [contractual language is ambiguous if it is reasonably susceptible to more than one interpretation].)

In the context of this case, the purchase order prepared by RGW contains wording that is specific about the product to be delivered. RGW included the phrases "*Quote*

*Number/Price confirmation Number – 092598-06*" and "*Wabco Modular STM600 w/bulkhead plates*" on the first page of its purchase order. These phrases might have been intended to change or supersede certain specifications issued by Caltrans. In hindsight, there is no dispute that Wabco Modular STM600 did not comply with all of Caltrans's specifications for joint seal assemblies. Thus, the inclusion of this particular model was inconsistent with Caltrans's specifications for the joint seal assemblies. Our analysis of whether the inclusion of the quote number and the model number created an ambiguity by possibly changing the specifications must be analyzed based on "the mutual intention of the parties *as it existed at the time of contracting*." (Civ. Code, § 1636, italics added.)

In this case, extrinsic evidence relevant to the intention of the parties as it existed at the time of contracting was introduced and admitted. That evidence relates to communications Biesinger had with Pitsch and Aboujudom before Watson countersigned the purchase order and is relevant to the existence of an ambiguity and how to resolve any ambiguity. Biesinger testified that he and Pitsch discussed Quote 02 and Pitsch asked Biesinger to present a new quote based on the description of the joint alone without the specifications.[11] Biesinger explained to Pitsch that the assemblies could not be bid on movement rating alone because of the skew angle. Biesinger also testified that he spoke with Pitsch's superior, Aboujudom, and explained why movement rating alone would not meet the project design and would not be accepted by Caltrans. Biesinger testified Aboujudom "was in the same mindset as John Pitsch was. He just wanted the movement rating alone." In response to Biesinger's testimony, RGW presented the testimony of Aboujudom and Pitsch, whose recollection of the conversations were different from Biesinger's.

---

[11] In this context, "description" means the description of Item 133 contained in Caltrans's addendum No. 2. Item 133 referred to a joint seal assembly with a movement rating of 101 to 160 millimeters.

Based on the wording of the purchase order and the parol evidence received by the trial court, we conclude that the parties' written contract was ambiguous about which specifications issued by Caltrans applied to joint seal assemblies referred to in the purchase order, and whether some of Caltrans's specifications were superseded by the purchase order's explicit reference to a two-cell model of a joint seal assembly. It follows from this conclusion that the parties' contract also was ambiguous about whether the four-cell joint seal assemblies delivered to RGW, and accepted by Caltrans, should have been the subject of a change order and price adjustment pursuant to paragraph 16 of the purchase order.[12]

### 5. Jury's Resolution of the Ambiguity

We reject RGW's argument that this court should direct the entry of judgment in favor of RGW because there is only one reasonable interpretation of the contract documents as to what exactly was ordered. We conclude the resolution of the contractual ambiguities were properly presented to the jury because of the conflicting evidence presented about Biesinger's telephone conversations with Pitsch and Aboujudom.

Conflicts exist in the testimony because, among other things, Pitsch testified that he did not understand that any subsequent quote that Watson might submit would not meet all of the plans and specifications for the project. Watson impeached this trial testimony using Pitsch's deposition in which he stated that he believed he did talk to Biesinger and answered "No" when asked if he recalled what that conversation was

---

[12] Paragraph 16 of the purchase order provides: "Buyer shall have the right to order in writing the omission or addition of or change in items covered by this Purchase Order. No change shall be valid unless authorized in writing by the Buyer. If Seller furnishes different or changed articles by reason of written instruction from the Buyer, the amount of adjustment shall be by mutual agreement of the parties; however, if no such agreement is reached, the adjustment shall be determined by arbitration. Nothing provided herein shall excuse the Seller from proceeding with the furnishing of the items as changed. The Seller shall not delay performance pending determination of the amount of such adjustment. In no event will the Buyer be liable for consequential damages."

about. In addition, Aboujudom testified that he did not recall discussing the skew involved in the design of the project with Biesinger. The different recollections of the witnesses about the telephone conversations meant that the jury had to determine which version of the conversations to believe and then use that version in evaluating and resolving the ambiguity in the purchase order.

It is a well-established principle of California contract law that when the interpretation of a written instrument turns on the credibility of extrinsic evidence, the trier of fact must resolve that conflict and determine the meaning of the instrument. (*Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865; *Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351; see *Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1166 [when parol evidence is in conflict, any reasonable construction will be upheld as long as it is supported by substantial evidence].)

Pursuant to this principle, we conclude that the interpretation of the purchase order was properly presented to the jury to resolve the ambiguity about which specifications applied to the joint seal assemblies referred to in the purchase order and which specifications had been expressly changed. We further conclude that the jury's interpretation in favor of Watson was supported by substantial evidence in the form of Biesinger's testimony and the contract documents. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness constitutes substantial evidence.].)

The first question in the special verdict asked the jury: "What was the amount of the subject agreement?" The jury was not asked to state how it resolved specific ambiguities in the agreement. The jury's answer of "$605,990" to first question necessarily implies that the jury found (1) the parties intended to expressly change the specifications when they referred to a particular model number for the joint seal assemblies; (2) after Caltrans returned the shop drawings for the two-cell joint seal assemblies, RGW presented Watson with written instructions to change the item ordered pursuant to paragraph 16 of the purchase order; and (3) Watson was entitled to a price

28.

adjustment in accordance with paragraph 16 because of RGW's change order. These findings are supported by substantial evidence and, as a result, RGW has failed to establish reversible error occurred in the trial court. As a result, the jury verdict and judgment in favor of Watson must be upheld.

E.     Other Issues Involving Watson's Contractual Claim

Watson's appellate briefing presented the alternate argument that the jury's verdict could be upheld under California Uniform Commercial Code section 2207, which sometimes is referred to as the battle-of-the-forms provision. (See *Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 515.) We need not address the application of California Uniform Commercial Code section 2207 because Watson has prevailed on another ground—namely, the interpretation of an ambiguous contract provision about whether the parties expressly changed the specifications for the joint seal assemblies.

II.     PREJUDGMENT INTEREST

Watson's cross-appeal challenges the trial court's order denying its request for prejudgment interest as untimely. Watson contends it made a timely request and the award of prejudgment interest was mandatory under Civil Code section 3287, subdivision (a).

A.     Basic Legal Principles

1.     *Statutory Text*

Civil Code section 3287, subdivision (a) provides: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." Under this provision, the trial court has no discretion—it must award prejudgment interest from the first day there exists both a breach and a

liquidated claim. (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 (*Rogers*).)

### 2. Interest as Damages

Conceptually, prejudgment interest is an element of damages, not a cost of litigation. (*Rogers*, *supra*, 65 Cal.App.4th at p. 830.) Prejudgment interest compensates the plaintiff for the loss of the use of property or money during the period before the judgment is entered. (*Id*. at p. 828.) This conceptual foundation affects the timing and manner for requesting an award of prejudgment interest.

### 3. The Certainty Requirement

From a plaintiff's perspective, prejudgment interest compensates for the loss of the use of the money during the period between the assertion of the claim and the rendition of judgment. (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 906 (*Chesapeake*).) Obviously, the plaintiff loses the use of the money whether or not the amount owed is certain and, consequently, compensation was not the Legislature's sole consideration when it adopted Civil Code section 3287.

From the defendant's perspective, the certainty requirement promotes equity because liability for prejudgment interest occurs only when the defendant knows or can calculate the amount owed and does not pay. (*Chesapeake, supra,* 149 Cal.App.3d at p. 906.) In *Chesapeake*, the court acknowledged the tension between compensating the plaintiff's loss and fairness to the defendant, stating:

> "These competing policy considerations have led the courts to focus on the defendant's knowledge about the amount of the plaintiff's claim. The fact the plaintiff or some omniscient third party knew or could calculate the amount is not sufficient. The test we glean from prior decisions is: did the defendant actually know the amount owed or from reasonably available information could the defendant have computed that amount. Only if one of those two conditions is met should the court award prejudgment interest." (*Id*. at p. 907, italics omitted.)

Under this test for certainty as to amount, a dispute or denial of *liability* does not make the *amount of damages* uncertain. (*Wisper Corp. v. California Commercial Bank* (1996) 49 Cal.App.4th 948, 958.) As stated by our Supreme Court: "Generally, the certainty required of Civil Code section 3287, subdivision (a), *is absent when the amounts due turn on disputed facts*, but not when the dispute is confined to the rules governing liability." (*Olson v. Cory* (1983) 35 Cal.3d 390, 402, italics added.) In that case, the court determined the salary and pension benefits owed to the members of the plaintiff class were readily calculable amounts for purposes of awarding prejudgment interest. (*Id*. at p. 402.)

Disputes about the amount owed do not automatically create uncertainty. The Supreme Court has "held that even a dispute as to the *amount* of alleged damages (from an earthquake) did not prevent those damages from 'being made certain by calculation' within the meaning of [Civil Code] section 3287 where the amount of recovery closely approximated plaintiff's claims." (*Leff v. Gunter* (1983) 33 Cal.3d 508, 520 (*Leff*).) In that case, a readily ascertainable value of the plaintiff's share of a development project was established by (1) the difference between (a) an uncontested appraisal of the completed building and (b) the amount of the mortgage against the property (2) divided by plaintiff's conceded one-sixth share in the original venture. (*Id*. at p. 519.) The court noted, "Defendants offered no evidence to contradict [the] valuations" of the three components used to calculate damages. (*Id*. at p. 520.) Consequently, the court reversed the trial court's denial of prejudgment interest and remanded the case for the calculation and award of such interest. (*Id*. at pp. 520-521.)

A general principle of practical import, not expressly adopted by our Supreme Court but easily inferred from its discussions of certainty, is that the manner in which a case is litigated can affect the ultimate resolution of the certainty question. (See *Olson*, *supra*, 35 Cal.3d at p. 402 ["amounts due turn on disputed facts"]; *Leff*, *supra*, 33 Cal.3d

31.

at p. 520 [no evidence contradicted components used in plaintiff's calculations; recovery closely approximated plaintiff's claims].)

> ### 4. Certainty and Changes to Construction Contracts

The certainty requirement has been applied to the amount owed under construction contracts for extra work or changes in the work. Such contracts might state the amount owed is (1) based on a cost-plus formula, (2) the reasonable value of the extra work done, or (3) based on the agreement of the parties. (See *Macomber v. State* (1967) 250 Cal.App.2d 391, 401.) Generally, a cost-plus formula permits the damages to be made certain by calculation and prejudgment interest is recoverable under such contracts. (*Anselmo v. Sebastiani* (1933) 219 Cal. 292, 301-303; *Schmidt v. Waterford Winery, Ltd.* (1960) 177 Cal.App.2d 28, 34 [amount due "might be made certain by reference to well-established value plus computation"].) Under contracts where the plaintiff is entitled to no more than the reasonable value of the extra work done, that value typically is ascertained by the trier of fact after considering conflicting evidence. (*Macomber v. State*, *supra*, at p. 401.) Consequently, damages in such cases are regarded as unliquidated and prejudgment interest is not mandatory. (*Ibid.*) Where the contractual amount owed is based on the agreement of the parties, the amount due may be made certain by the agreement of the parties or an admission. (*Pilch v. Milikin* (1962) 200 Cal.App.2d 212, 228 ["defendant knew the amount of the sum owing, and he admitted the fact upon the trial"].)

> ### 5. Offsets Do Not Create Uncertainty as to the Balance Due

"'Ordinarily, where the amount of a demand is sufficiently certain to justify the allowance of interest thereon, the existence of a set-off, counterclaim, or cross claim which is unliquidated will not prevent the recovery of interest on the balance of the demand found due from the time it became due.'" (*Worthington Corp. v. El Chicote Ranch Properties, Limited* (1967) 255 Cal.App.2d 316, 325.) The phrase "the balance of

the demand" means the liquidated sum minus the offset.  (*Burgermeister Brewing Corp. v. Bowman* (1964) 227 Cal.App.2d 274, 285.)  Thus, prejudgment interest is calculated on the *net* amount owed and, therefore, the defendant is not required to pay interest on the portion of the debt rightfully withheld.  (*Id*. at pp. 285-286.)  The rationale for this rule is that the plaintiff was never entitled to payment of more than the net amount and, therefore, was damaged only by the withholding of the net amount.  (*Id*. at p. 286.)

The application of the rule about offsets to RGW's successful cross-complaint is not a source of controversy.  Thus, the calculation of any prejudgment interest owed to Watson must be based on the *net amount owed* under the contract—that is, $494,219 ($605,990 minus $111,771)—and must take into account the timing and amount of RGW's two payments.

### 6.    *Standard of Review*

Where the facts are not in dispute or, alternatively, have been established by findings of the trial court supported by substantial evidence, appellate courts independently review whether and when the plaintiff's damages were made certain or capable of being made certain by calculation.  (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 390-391.)  This standard of review can be phrased in terms of the test adopted in *Chesapeake* (see pt. II.A.3, *ante*):  "On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was known or available to the defendant at the time."  (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151.)

### B.    Timeliness and Format of Request

#### 1.    *Watson's Pleadings*

Watson's initial complaint included a prayer for "interest as provided by law." Watson first amended complaint reiterated the request for "interest as provided by law," but addressed interest in more detail.  Paragraph 32 of the first amended complaint stated

33.

that Watson "is entitled to the payments owed by RGW as well as interest on the money that RGW has wrongfully withheld at the statutory rate. The interest runs from the date that the payments became due until the date that they are paid." These statements clearly notified RGW that Watson sought both prejudgment and postjudgment interest on the amount owed. (See *Rogers*, *supra*, 65 Cal.App.4th at p. 829 [prayer seeking ""'such other and further relief as may be proper"'" is adequate basis for award of prejudgment interest].)

We also note that the breach of contract cause of action in Watson's first amended complaint identified the price of $605,990 provided in Quote 02, alleged RGW had refused to pay that price, and alleged Watson "has been damaged in the amount of $605,990."

### 2. Watson's Postjudgment Request

The following is the chronology of events surrounding Watson's written request for prejudgment interest:

April 21, 2014: The jury completed the special verdict form.

May 16, 2014: RGW filed a motion for judgment notwithstanding the verdict, or alternatively for a new trial.

June 11, 2014: Hearing on RGW's motion for judgment notwithstanding the verdict, or alternatively for a new trial.

June 19, 2014: The judgment was filed.[13]

June 27, 2014: Watson filed its request for prejudgment interest.

---

[13] The proposed form of judgment was faxed to the court by Watson's attorneys. The proposed judgment did not explicitly refer to prejudgment interest, but provided for postjudgment interest at 10 percent and included the following item: "(4) Additional sums due, if any, are as follows: _____;". Nothing in the record shows that Watson regarded this item as a request for prejudgment interest, much less communicated that intention to the court and RGW. The trial court struck the fourth item from the proposed judgment before signing, dating and filing the document as its judgment.

July 18, 2014: Notice of entry of judgment was served on RGW by Watson's attorneys.

August 5, 2014: Order denying Watson's request for prejudgment interest was filed.

August 6, 2014: Order denying RGW's motion for judgment notwithstanding the verdict, or alternatively for a new trial was filed.

Later in August 2014, the parties filed their notices of appeal and cross-appeal. To summarize, Watson made its request for prejudgment interest eight days after the judgment was filed, which was before the 15-day period contained in Code of Civil Procedure section 659, subdivision (a)(2), expired.

Watson's request (1) referred to its complaint and a trial exhibit, (2) set forth the legal basis for the award of prejudgment interest, and (3) provided detailed calculations of prejudgment interest to August 2014. The calculation took into account the $111,771 awarded to RGW on this cross-complaint, RGW's payment of $88,147 to Watson in June 2013, and RGW's payment of $23,039.60 to Watson in November 2013.

### 3. *Timing of Request for Prejudgment Interest*

No statutes specify the timing or mechanism for seeking prejudgment interest. (*Steiny & Co., Inc. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 294 (*Steiny*).) Similarly, no rule of court specifies when prejudgment interest must be sought. (*Ibid.*) California Rules of Court, rule 3.1802 states, "The clerk must include in the judgment any interest awarded by the court." This rule imposes a mandatory duty on the clerk, but only tenuously implies that a request for prejudgment interest must be made before a judgment is entered.

In *Steiny*, the court concluded that the award of interest after entry of the judgment was proper where the complaint requested prejudgment interest and the parties stipulated that request for interest would be adjudicated in a postjudgment hearing. (*Steiny, supra,* 79 Cal.App.4th at p. 294.) In *Rogers*, *supra*, 65 Cal.App.4th 824, the court stated that, at the latest, a request for prejudgment interest could be pursued as part of a motion under

Code of Civil Procedure section 657, subdivision 5, on the ground of "inadequate damages." (*Rogers*, *supra*, at p. 830.) The court stated such a motion would be timely if made within the "time limits for a motion for new trial (Code Civ. Proc., § 659)." (*Ibid.*)

In the present case, there is no dispute that Watson's request for prejudgment interest was made less than 15 days after the judgment was filed. As such, the request was made within the statutory time limit for motions under Code of Civil Procedure section 657. (Code Civ. Proc., § 659, subd. (a)(2).) Consequently, we conclude Watson's request for prejudgment interest was timely.

### 4. Proper Format of a Request for Prejudgment Interest

The trial court denied Watson's request for prejudgment interest "as untimely made." The court then stated that requests "must be made by way of a motion prior to entry of judgment or in the form of a motion for new trial." The court's order implies that it regarded the form of Watson's request as procedurally improper. Consequently, we consider whether the format of Watson's request rendered it defective. In particular, we consider whether the request qualifies as a motion under Code of Civil Procedure section 657.[14]

As a general rule, a new trial may be granted pursuant to Code of Civil Procedure section 657 only if the request conforms to the statutory procedures. (*Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 726 (*Shapiro*).) We interpret this general rule as applying not only to new trials but to requests for modification under Code of Civil Procedure section 657. The statutory procedures set

---

[14] Code of Civil Procedure section 657 covers motions for new trial and also authorizes a decision to "be modified" on the grounds specified in the subdivisions of that section. A request for prejudgment interest is not a request for a new trial (an opportunity to present evidence to a trier of fact), but a request to modify the decision to include an award of prejudgment interest. Consequently, we use the phrase "motion under Code of Civil Procedure section 657" rather than "motion for new trial" to describe a motion under that section seeking modification of a judgment to include prejudgment interest.

forth in Code of Civil Procedure section 659 require the motion to (1) designate the grounds upon which it is made and (2) state "whether the same will be made upon affidavits or the minutes of the court, or both."  (Code Civ. Proc., § 659, subd. (a); see 8 Witkin, Cal. Procedure (5th ed. 2008) Attack on Judgment in Trial Court, § 48, pp. 634-635 [statutory requirements for motion for new trial].)

First, the fact that Watson's request was not labeled as motion for new trial or as a motion for modification under Code of Civil Procedure section 657 does not render its format defective.  (See *Shapiro*, *supra*, 52 Cal.App.4th at p. 728 [styling a request as a motion to vacate, rather than a motion for new trial, was of no consequence]; see 8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, § 47, pp. 632-634 [motion improperly labeled].)

Second, compliance (or substantial compliance) with the requirements of subdivision (a) of Code of Civil Procedure section 659, depends upon whether the request provides the relevant information to the opposing party and the court and gives the adverse party a reasonable opportunity to oppose the request on its merits.  (*Nichols v. Hast* (1965) 62 Cal.2d 598, 600 [J. Traynor]; see *Shapiro*, *supra*, 52 Cal.App.4th at pp. 727-728.)  These functions are satisfied when the written request designates the grounds upon which it is made.  Here, Watson's request clearly identified (1) the relief requested (i.e., the addition of prejudgment interest to the amount of the judgment) and (2) the grounds upon which the request was based—specifically, Civil Code section 3287, subdivision (a) and its contention that the damages were a liquidated sum.  Furthermore, Watson provided RGW a sufficient opportunity to oppose the request, as is evident from the written opposition filed by RGW with the court.  Consequently, we conclude Watson's request provided RGW with the sufficient notice and a reasonable opportunity for opposition, thus satisfying the purpose and requirements of Code of Civil Procedure section 659, subdivision (a).

Third, the requirement that a motion under Code of Civil Procedure section 657 designate "whether the same will be made upon affidavits or the minutes of the court, or both" (Code Civ. Proc., § 659, subd. (a)), is not a jurisdictional. (*Nichols v. Hast*, *supra*, 62 Cal.2d at p. 600.) Moreover, the specific statement of the grounds for Watson's request was sufficient to imply that it was made on the minutes of the court and the exhibits and testimony presented at trial. (*Id*. at p. 601.) Therefore, we conclude that Watson's request substantially complied with the statute even though it did not expressly state whether it was "made upon affidavits or the minutes of the court, or both." (Code Civ. Proc., § 659, subd. (a).)

In summary, we conclude that the format of Watson's request for prejudgment interest was not defective and, therefore, we proceed to the merits of the request.

### C.     Watson's Claim That a Change Order Was Required

#### 1.     *Watson's Theory of Liability*

Watson's respondent's brief contends that after Caltrans rejected the two-cell joint seal assemblies, a change order for a different price was required pursuant to paragraph 16 of the purchase order. Watson also contends that "RGW refused to issue a change order and claimed it was only required to pay for the rejected joint seals …, not for the joint seals it received and incorporated into the completed project."

The foregoing contentions made by Watson are consistent with the arguments it pursued in the trial court. The trial court described Watson's contentions in the court's instructions to the jury by stating: "Watson Bowman claims that the original contract was modified or changed. Watson Bowman must prove that the parties agreed to the modification. RGW denies that the contract was modified." The jury impliedly found Watson's theory of liability was correct and a change order for a different price was required when it answered the first question in the special verdict form in Watson's favor.

### 2. Watson's Theory of Damages

The jury's implied finding that a change order for a different price was required by the contract meant the jury also had to determine what that different price should have been. To assist the jury in making this determination, the trial court gave general instructions about the damages to be awarded in a breach of contract case, stating that if a party proved its breach of contract claim, "you also must decide how much money will reasonably compensate that party for the harm caused by the breach. This compensation is called damages. The purpose of such damages is to put the non-breaching party in as good a position as it would have been if the other party had performed as promised." As to the amount, the court stated: "The non-breaching party also must prove the amount of its damages according to the following instructions. It does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages." The court then stated that Watson claimed damages for nonpayment.[15]

These instructions addressing damages were applied by the jury in answering the first question of the special verdict form. That question asked, "What was the amount of the subject agreement?" The jury found the amount was $605,990.

### 3. The Evidence and Arguments Presented to the Jury

Whether the change order price of $605,990 was sufficiently certain for purposes of awarding prejudgment interest must be evaluated in the context of not only the historical facts that occurred before the litigation, but also the arguments and evidence presented to the jury. (See *Olson*, *supra*, 35 Cal.3d at p. 402; *Leff*, *supra*, 33 Cal.3d at p. 520.) The foundation for the parties' arguments about whether a change order was contractually required and the amount of any such order was paragraph 16 of the

---

[15] Thus, the court did not instruct the jury that if Watson proved the contract had been modified and RGW breached the modified contract, the jury must find the modified contract price was a particular amount. Similarly, the court did not instruct the jury to perform specific calculations or use a particular formula to determine Watson's damages for the alleged breach of contract

purchase order. Paragraph 16 stated that if Watson furnished different or changed items by reason of written instructions from RGW, "the amount of the adjustment shall be by mutual agreement of the parties; however, if no such agreement is reached, the adjustment shall be determined by arbitration." Paragraph 16 also addressed the possibility that a supplier might withhold delivery of the changed items during the negotiations of the price adjustment by providing: "Nothing provided herein shall excuse the Seller from proceeding with the furnishing of the items as changed."

Watson and RGW never expressly agreed to the amount of the adjustment and never submitted the matter to arbitration pursuant to paragraph 16 of the purchase order. Thus, the amount owed by RGW to Watson for changing the order to four-cell joint seal assemblies was never rendered certain by an express agreement of the parties or by an arbitration award.

The evidence relied upon by Watson for the amount owed on the contract was Quote 02, from September 2009, and its price of $605,990 for the 146 units of WaboModular BET-1200 joint seal assemblies. In September 2010, Watson requested a change to the purchase order to reflect the original price in Quote 02 of $605,990. RGW did not present evidence addressing the value of those units. Instead, RGW focused on the question of liability and its theory that there was no change order requiring a price adjustment.

During closing argument, counsel for Watson addressed how the jury should answer the question in the special verdict about the amount of the subject agreement. Counsel asked the jury to "[l]ook at their Paragraph 16, look at the terms, consider the revised and resubmit letter, and decide if a change order was merited, if a change order was deserved by Watson." As to amount, he stated, "So I guess I would put in this one 605,990. That's the amount of the bid day quote. That's the cost of the four-cell joints."

Counsel for RGW told the jury that the "fundamental issue here is whether Watson Bowman is going to be held to the terms of the contract it signed." In other

40.

words, RGW argued that there had been no change order or modification of the contract formed when Watson Bowman signed the purchase order. As a result, counsel for RGW addressed the question in the special verdict form about "the amount of the subject agreement" by arguing the correct answer was $222,957.68—the amount typed on the first page of the purchase order.

The jury answered the first question on the special verdict form by finding the amount of the subject agreement was $605,990. This amount was (1) stated in Quote 02 in 2009, (2) requested by Watson in its request for a change order in 2010, (3) identified as the amount of Watson's damages in its first amended complaint in 2012 and (4) suggested by Watson's attorney in closing argument in 2014.

### 4. Analysis

Watson's entitlement to prejudgment interest under Civil Code section 3287, subdivision (a) depends on whether the compensation RGW owed Watson for delivering the four-cell joint seal assemblies was "certain, or capable of being made certain by calculation" for purposes of the statute. Based on the principles set forth in *Olson* and *Leff*, we conclude the requisite level of certainty was achieved and Watson is entitled to prejudgment interest.

Applying the test set forth in *Chesapeake*, *supra*, 149 Cal.App.3d 901, we conclude that RGW could have determined the amount owed from "reasonably available information." (*Id*. at p. 907.) RGW had possession of Quote 02 and had been informed by Watson, in prelitigation correspondence and in later in pleadings, what Watson regarded as the appropriate price for the four-cell joint seal assemblies. RGW has argued the amount was uncertain, but has not identified any additional information about price or value that was not in its possession at the time the joint seal assemblies were delivered in August 2011. Moreover, like the defendants in *Leff*, RGW "offered no evidence to contradict" the amount asserted by Watson. (*Leff*, *supra*, 33 Cal.3d at p. 520.) Therefore,

41.

as a practical matter, this case involved a dispute over liability and not a dispute about the amount owed in the event that RGW lost on the liability question. Consequently, it was not a case in which the "amounts due turn on disputed facts." (*Olson*, *supra*, 35 Cal.3d at p. 402; *Leff*, *supra*, at p. 520 [no evidence contradicted components used in plaintiff's calculations].)

Therefore, we conclude that the amount of damages awarded for RGW's breach of contract was sufficiently certain for purposes of Civil Code section 3287, subdivision (a). Consequently, Watson is entitled to prejudgment interest.

D.      Paragraph 2 of the Purchase Order[*]

1.      *Statutory Text*

Civil Code section 3289 addresses the rate of interest chargeable after a breach of contract and provides in relevant part:

> "(a)  Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.
>
> "(b)  If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

RGW contends that a legal rate of interest was stipulated by the purchase order's "no interest" provision, because zero percent interest is a "legal rate of interest" for purposes of the statute.

2.      *Contractual Text*

RGW's contention that the purchase order bars Watson's claim to prejudgment interest raises a question about how the contract should be interpreted. The provisions relevant to the interpretation include paragraphs 2 and 3 of the purchase order, which state:

---

[*]      See footnote, *ante,* page 1.

42.

"2. It is understood and agreed that *no interest*, service or carrying charges will be paid by Buyer on this order or *any change to it*, unless otherwise stated in this order.

"3. Unless otherwise specified herein, terms of payment shall be net cash within thirty days after receipt of the invoice." (Italics added.)

Other provisions that may be relevant to the question of interpretation are set forth in Quote 06, which we previously concluded was incorporated by reference into the contract formed by the parties. (See pt. I.C.4, *ante*.)[16] The contractual language that will determine the applicability of the provisions in Quote 06 are the provisos at the end of paragraph 2 and at the beginning of paragraph 3 of the purchase order that refer to something "otherwise stated in this order" or "otherwise specified herein." The specific question presented is how incorporation by reference affects the meaning of the terms "this order" and "herein."

The language in Quote 06 that might affect the award of prejudgment interest is set forth on its first page in a paragraph to the left of the box containing the "Total Quote Price (USD)." That paragraph addresses delivery and payment terms by stating: "F.O.B. Place of Shipment; 2% 20 days; Net 30 Days; 1.5% month service charge on past due accounts." Watson contends that the 1.5 percent per month service charge overrides the "no interest, service or carrying charges" provision in paragraph 2 of the purchase order and, thus, negates RGW's claim that the parties agreed to no interest prior to the judgment.

### 3. *Contractual Ambiguity*

The threshold question for trial and appellate courts addressing the meaning of contractual provisions is whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation. (*Winet v. Price*, *supra*, 4 Cal.App.4th at p.

---

[16] This earlier conclusion significantly undermines RGW's arguments about how to interpret the contract because RGW's arguments assume that it has won, not lost, the incorporation by reference issue.

43.

1165.) Ambiguity is regarded as a question of law and is subject to independent review. (*Smith v. Adventist Health System/West*, *supra*, 182 Cal.App.4th at p. 755.)

We conclude that paragraphs 2 and 3 of the purchase order are reasonably susceptible to the interpretation that "no interest, service or carrying charge [would] be paid by [RGW] on … any change to [the purchase order]," no matter how long it took Watson to enforce an obligation to pay for a change order. This interpretation is based on reading the "otherwise stated in this order" proviso at the end of paragraph 2 as being limited to the four corners of the purchase order and excluding documents incorporated by reference.

Alternatively, we conclude that the prepositional phrase "in this order" contained in the "unless otherwise stated in this order" proviso at the end of paragraph 2 is reasonably susceptible to the interpretation that the purchase order includes all documents incorporated by reference. In other words, documents incorporated by reference are "in this order" because documents are incorporated into the purchase order "as fully as if written herein." (See pt. I.C.4, *ante* [incorporation by reference].) If the proviso is interpreted in this manner, the contract as a whole is reasonably susceptible to the interpretation that interest or a service charge is to be paid if RGW does not make payment within the 30 days specified in paragraph 3 and mentioned in Quote 06.

In summary, we decide the threshold question of contractual interpretation by concluding that the parties' contract is ambiguous.

### 4. *Resolving the Contractual Ambiguity*

When a contractual ambiguity exists, the next analytical step is to determine whether the resolution of that ambiguity presents a question of law or, alternatively, a question of fact. (See pt. I.B.2, *ante*.) Here, the parties did not present conflicting parol evidence relevant to the meaning of the ambiguous provisions and, therefore, we will treat the resolution of the ambiguity as a question of law and subject to independent

44.

review.  (*Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351; see *Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865 [choosing among conflicting inferences is solely a judicial function].)

"Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions. [Citation.]' [Citation.] 'The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable. [Citation.]' [Citation.]" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269.)  The reasonableness standard mentioned in this principle is an objective standard.  Thus, courts seek the objectively reasonable meaning of the contract's language, not the parties' unexpressed intentions or subjective expectations.  (*Alexander v. Codemasters Group Limited*, *supra*, 104 Cal.App.4th at p. 141; *Scheenstra v. California Dairies, Inc.*, *supra*, 213 Cal.App.4th at p. 393, fn. 16.)

First, we resolve the contractual ambiguity by concluding that an objectively reasonable person reading the provisio in paragraph 2 of the purchase order and the purchase order's language relating to documents "incorporated herein as fully as if written herein" would conclude that Quote 06 is "in this order" and, thus, covered by the provisio.  As a result, any term in Quote 06 stating otherwise than is stated in paragraph 2 of the purchase order would control over paragraph 2.

Second, an objectively reasonable person would read Quote 06's provision for a "1.5% month service charge on past due account" as superseding the "no interest, service or carrying charges" language in paragraph 2 of the purchase order.  Quote 06's "service charge" is in fact an interest rate because it is stated as a percent calculated on a monthly basis and is not a lump sum.  Therefore, the interest or service charge authorized by Quote 06 directly contradicts the "no interest" provision in paragraph 2 of purchase order and, as a result of the proviso, the interest or service charge in Quote 06 is controlling.

In summary, we interpret the entirety of the documents comprising the parties' contract as allowing Watson to recover prejudgment interest.  As a result of this

interpretation, we need not address the other grounds for awarding prejudgment interest that are raised in the cross-appeal.

### 5. *Rate of Interest*

The last question we address is implied by arguments presented in Watson's appellate briefing, which suggest that this court should conclude that Watson is entitled to prejudgment interest at the rate of 1.5 percent per month. We reject this suggestion because Watson's written request to include prejudgment interest filed with the trial court did not request this higher rate and, instead, relied solely on Civil Code section 3287 and requested interest at the statutory rate of 10 percent per annum.

Perhaps at the time Watson filed its request it believed that (1) the no interest or service charge provision in the purchase order conflicted with the 1.5 percent per month service charge stated in Quote 06; (2) the conflicting provisions canceled one another; and (3) the negation of the provisions meant the statutory provisions governing prejudgment interest controlled. Regardless of Watson's reasons for requesting the lower 10 percent per annum interest rate, we conclude that Watson has forfeited its claim to the higher rate by its failure to request that rate in a timely fashion. In other words, the issue of the proper rate cannot be raised for the first time on appeal. Therefore, we conclude that Watson's request for prejudgment interest is limited to the statutory 10 percent referred to in the papers filed with the trial court.

## III. PROTECTIVE CROSS-APPEAL*

The evidentiary issues raised in Watson's protective cross-appeal need not be addressed because Watson prevailed on the issues raised in RGW's appeal and, as a result, there will be no further proceeding at which such evidence might be introduced.

---

\*      See footnote, *ante,* page 1.

**DISPOSITION**

The judgment is affirmed, except insofar as it failed to award Watson prejudgment interest.  The case is remanded to the trial court for the purpose of calculating and awarding Watson prejudgment interest.  Watson shall recover its costs on the appeal and cross-appeal.

_____

FRANSON, J.

WE CONCUR:


_____

POOCHIGIAN, Acting P.J.


_____

SMITH, J.