Filed 6/27/25

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| INTERNATIONAL CURRENCY TECHNOLOGIES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ICT, INC.,<br><br>        Defendant and Appellant. | A170714<br><br>(Alameda County<br>Super. Ct. No. RG16828743) |

In 2018, a jury found in favor of plaintiff International Currency Technologies (International) on its cause of action for conversion against defendant ICT, Inc. (ICT), and awarded International $550,000 in damages.[1] ICT moved for a new trial, arguing that the award was not supported by the evidence. The trial court denied the motion as to the conversion claim, but ordered a new trial on other issues. Litigation continued over the next six years.

Then, in 2024, International moved for prejudgment interest on its damages award from the date of the 2018 jury verdict. The trial court

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion. Further rule references are to the California Rules of Court.

[1] Because there is variation in how the parties refer to themselves in both the briefing on appeal and the trial court below, we identify plaintiff as "International" and defendant as "ICT" to avoid any confusion.

granted the motion and entered judgment for International with $222,893.08 in prejudgment interest.

On appeal, ICT argues that (1) the $550,000 damages award is not supported by substantial evidence and the trial court erred in concluding otherwise when it denied ICT's motion for a new trial on the cause of action; and (2) the trial court erred in awarding prejudgment interest from the date of the jury verdict on that claim. We disagree and affirm.

## BACKGROUND

International filed this action against ICT in 2016, naming another entity and two individuals as additional defendants. The operative first amended complaint asserted causes of action for (1) breach of fiduciary duty and conversion, (2) unfair competition, and (3) violation of the Lanham Act (15 U.S.C. § 1051 et seq.). It alleged that Yuan Fong Chang was the founder and chairman of International, whose "primary business activities" were "the manufacture and sale of vending machines utilized to exchange currency." It alleged that Chang's sister-in-law and nephew worked for International, but then breached their fiduciary duties by forming ICT. It alleged that ICT took over International's warehouse, converted property, and diverted sales and customers to ICT.

ICT filed a cross-complaint against International asserting claims for intentional interference with contractual relations and conversion. It alleged that International had interfered with ICT's performance of customer contracts and taken possession of a customer payment for products and services that were provided by ICT.

The matter proceeded to a jury trial in 2018 before the Honorable Harry Jacobs. The jury found in favor of International on its conversion cause of action and awarded it $550,000 in damages.

2

While International had dismissed its breach of fiduciary duty claim against Chang's nephew before deliberations, the jury found that Chang's sister-in-law had not breached her fiduciary duty. On the Lanham Act cause of action, the jury found in favor of International. It found International had sustained no actual damages, but ICT's sales were $11 million. On the cross-complaint, the jury found in favor of ICT and awarded it $4,609 in damages.

ICT moved for a new trial on the conversion and Lanham Act causes of action. It argued, among other things, that the $550,000 damages award for conversion was not supported by the evidence. The trial court denied the motion as to the conversion claim, but ordered a new trial on Lanham Act damages because of an erroneous jury instruction that directed the jury to determine ICT's sales instead of its profits. (See 15 U.S.C. § 1117, subd. (a) [providing for recovery of "defendant's profits" subject to principles of equity].) International also sought a new trial on punitive damages for its conversion claim, which it had previously waived, following a retrial on the Lanham Act damages. The trial court ordered a trial to determine both the entitlement and amount of punitive damages on the conversion claim.

Litigation continued over the next six years. In September 2021, International represented to the court that it would no longer pursue punitive damages on the conversion claim or profits under the Lanham Act. International sought entry of a final judgment in the action, with the $550,000 jury award to International offset by the $4,609 jury award to ICT, and a permanent injunction against ICT regarding its use of names. A years-long dispute regarding injunctive relief followed. The court (Honorable Brad Seligman) ultimately denied International's request for a permanent injunction in February 2024.

One week later, International moved for prejudgment interest on its $550,000 damages award from the date of the 2018 jury verdict. The trial court (Honorable Brad Seligman) granted the motion. Judgment was entered for International with net damages of $545,391, and $222,893.08 in prejudgment interest. This appeal followed.

## DISCUSSION

ICT challenges the judgment on International's conversion claim in two primary respects. First, ICT argues that the $550,000 damages award is not supported by substantial evidence and the trial court erred in concluding otherwise when it denied ICT's motion for a new trial on the conversion claim. Second, ICT argues that the trial court erred in awarding prejudgment interest on the damages award from the date of the verdict. We address, and reject, each argument in turn.

## I. *Substantial Evidence*

### A. *Additional Background*

In 2001, Chang formed International to distribute bill acceptors—used in vending and game machines—in the United States. The bill acceptors were manufactured by a family business in Taiwan formed by Chang and his wife. International moved into a warehouse in Fremont, California (warehouse) several years later. In 2016, the warehouse contained an inventory of bill acceptors, as well as office furniture and computers.

To prove its conversion claim at trial, International argued that it was "evicted" from the warehouse property in May 2016, with ICT taking possession of the bill acceptor inventory, furniture, computers, and other equipment. Several witnesses offered testimony related to this claim, including (1) Chang, (2) his daughter Ling-Chi (Melody) Chang, and (3) employee Chen Hung (Albert) Lin.

4

### 1. Chang's Testimony

Chang testified that, sometime after 2010, he was removed as chair of the family business in Taiwan and replaced by his wife and son. Chang formed a new corporation, Top VME, that designed bill acceptors made in China. Chang did not live in the United States and his sister-in-law managed International. He did not have a key to the warehouse and did not visit it regularly.

In April 2016, Chang's wife asked him to give International to their son. Chang did not agree. Chang then received a notice that International's lease of the warehouse property in Fremont would end on May 31, 2016. According to Chang, he was not aware of any lease and had believed the warehouse was purchased in International's name.

Chang travelled to the United States. On May 8, 2016, he went to the warehouse with his nephew and saw "a lot of inventory." Chang took three photographs of boxes of inventory in the warehouse. These photographs were admitted into evidence. He did not remove anything from the warehouse on this trip and went back to Taiwan.

Chang returned to the warehouse in July 2016. He was asked "to come pick up some trash or junk," including a computer that was not operational. He did not receive any bill acceptor inventory or office furniture. He took the "useless" materials to another warehouse he had rented, but left them untouched.

### 2. Daughter's Testimony

Chang's daughter testified that the warehouse property was originally purchased by a limited liability company she had formed with her brother for $2,250,000. That company also purchased a house in Milpitas for $550,000.

Employees of the family business in Taiwan traveling to California stayed at the house.

According to Chang's daughter, International entered into a lease for the warehouse property. Prior to the expiration of that lease term, Chang's daughter told him that he had to stop his new business, Top VME, and then they could "talk about" extending the lease. But it was "not possible" that the warehouse would be rented to a "competitor" of the family business in Taiwan.

ICT was formed in April 2016 after Chang refused to suspend his Top VME business. Chang's daughter and son are directors of ICT. ICT distributed bill acceptors manufactured by the family business in Taiwan because that business would no longer allow distribution by International.

Chang's daughter testified that, at the end of International's lease, Chang had "left 400 boxes in the warehouse, and also a BMW car and also a Camry car." She described them further as "400 boxes, including maybe papers and machines." She testified that her father removed items from the warehouse in July 2016. When asked about the boxes depicted in one of Chang's three photographs, his daughter testified: "Those are not the box that my father move out." When asked whether the 400 boxes contained inventory, she testified: "I saw a lot of new inventory. I mean, the boxes in the warehouse. But I didn't really look carefully what is that."

### 3. Employee's Testimony

Albert Lin testified that, in January 2016, he was hired as a sales manager for the family business in Taiwan. Two months later, he accepted an offer for the same position at International and came to visit the warehouse property in Fremont. He saw inventory, office furniture, and computers. When asked what happened to this inventory, sitting in the

warehouse as of March 2016, Lin testified that it was sold to customers in the United States.

Lin estimated that bill acceptors are packed into boxes that are two feet by two feet square. But when shown one of Chang's photographs, he agreed that those boxes were "probably more like" three feet high by two feet wide.

Lin testified that the number of bill acceptors packed in a box varies, for example, on whether the bill acceptor has a money stacker. He estimated that "about six" are packed in each box. But when shown one of Chang's photographs, Lin testified that those boxes contained model "A-6" bill acceptors. Lin estimated that the size of that model unit would be approximately one foot by one foot, depending on the stacker size.

When asked to estimate the purchase price of bill acceptors at the time of trial, Lin estimated a range of approximately $100 to $200 depending on the model. When asked to estimate the dollar amount of inventory in the warehouse at the time of trial, Lin testified that he did not know. When asked to estimate the quantity of bill acceptors sitting on the floor of the warehouse, Lin testified: "Maybe a few hundred."

### 4. Sales and Tax Records

ICT's sales invoices dated April 14, 2016 were admitted into evidence at trial. One invoice showed the sales price for 118 "A6" bill acceptors (with stackers) at $125 each. International's 2015 tax return was also admitted into evidence, but is not included in the record on appeal. Chang's sister-in-law testified that this tax return claimed a $35,396 depreciation value for warehouse equipment, furniture, and computers.

### 5. Jury Instructions and Verdict

The jury was instructed on the factual elements of International's claim that the converted property included "inventory, equipment, customer lists,

computers and bank accounts." The jury instruction on damages identified the property in this same way. On the special verdict form, the first question asked: "Did [International] own the inventory, equipment, customer lists, computers and bank accounts?" The second question asked: "Did [ICT] intentionally take possession of [International] property for a significant period of time and refuse to return it to [International]?" The verdict form did not ask the jury to specify the amount of damages attributable to each category of property.

During deliberations, the jury asked the following question: "The word 'property' in Number 2 of verdict form VF2100, does it refer to the items in question 1?" The trial court suggested, and counsel for both parties agreed, that the answer was "Yes." The jury was so instructed.

The jury reached a verdict in favor of International on its conversion claim, and awarded International $550,000 in damages.

### 6. Motion for New Trial

ICT moved for a new trial arguing, among other things, that the damages award for conversion was excessive and not supported by the evidence. ICT argued that International had not presented sufficient evidence of the "fair market value" of its inventory, computers, equipment, furniture, and bank accounts to support the award. As for the inventory, ICT argued that the jury had rejected International's theory that the inventory should be valued at $2,049,223 based on ICT's balance sheet as of December 31, 2016. As for the computers, equipment, and furniture, ICT argued that the " 'best' evidence" concerning its fair market value was the " 'depreciated value' " as reflected on International's tax returns. ICT cited closing argument by International's counsel for a valuation of those items between "$25,000 to $50,000," as well as the testimony by Chang's sister-in-law that

8

International's 2015 tax return showed a depreciated value of $35,396 for equipment, furniture, and computers.

### 7. Trial Court's Ruling

The trial court (Honorable Harry Jacobs) denied ICT's motion for new trial on the conversion claim. As for the inventory, the court found that the jury had "several bases" for its calculation "without having to resort to speculation of sales amounts." It cited testimony from Chang's daughter that there were " '400 boxes' of product on the floor of the warehouse," and testimony from Lin that there were " 'a few hundred' boxes of bill acceptors in the warehouse." It cited evidence that boxes held "about six" bill acceptors and were "2 feet by 2 feet, or even 2 feet by three feet." It cited testimony from Lin that "each bill acceptor had a sales value of between $100 and $200." Accordingly, the jury could have multiplied 400 boxes by six units per box, with a $200 purchase price, to get $480,000. Or it could have multiplied 400 boxes by 10 units per box, with a $125 purchase price, to get to $500,000. Then, for the computers, equipment, and furniture, the trial court found there was evidence of value "in the neighborhood of $35,000," as conceded by ICT, and "[t]ax records indicating depreciation allowances showed varying amounts, including $50,000 in 2015."

The trial court explained that, if the jury had accepted the $500,000 figure for inventory and the $50,000 figure for computers, equipment, and furniture, it "likely used calculations similar to that one in reaching its verdict" and rejected International's "more speculative request for accounts receivable and bank account figures, for which there was some, but not much, evidence." The trial court concluded: "It appears to the court that the award for conversion of property was well within the bounds of both reason and the evidence adduced at the trial, and the verdict should be allowed to stand."

9

**B.** *Framework and Standard of Review*

ICT's challenge to the $550,000 damages award on International's conversion claim takes two forms: it argues that (1) the jury's award was not supported by substantial evidence, and (2) the trial court erred in concluding otherwise when it denied ICT's motion for new trial. Because both arguments attack the sufficiency of the evidence, we address them together.

On a substantial evidence challenge, "we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660, quoting *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup*, at p. 660.)

In determining whether the jury's $550,000 damages award is supported by substantial evidence, the question before us is this: "Does the record, viewed in the light most favorable to the jury's verdict, contain evidence that is reasonable, credible and of solid value sufficient to support the jury's verdict?" (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 890.) And in reviewing the ruling on ICT's motion for new trial, the trial court is accorded great deference. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 (*Fassberg*).) "[W]e can reverse the denial of a new trial motion based on insufficiency of the evidence or excessive damages only if there is no

10

substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Ibid.*)

## C. *Analysis*

ICT argues that the evidence regarding (1) inventory and (2) computers, furniture, and equipment does not support the jury's $550,000 damages award here.[2]  On the issue of inventory, ICT contends that the jury "could not reasonably approximate the number of inventory boxes, the number of bill acceptors, the types of bill acceptors, the wholesale price of the inventory, or the retail price of the inventory."  The record reflects otherwise.

As to the number of boxes, Chang's daughter testified that her father had "left 400 boxes" in the warehouse.  ICT argues that there was insufficient evidence that these boxes were inventory, because Chang's daughter was "unsure of their contents."  But it was reasonable for the jury to credit Chang's testimony that he saw boxes of inventory when he visited the warehouse on May 8, 2016, as well as his photographs of the boxes and Lin's testimony that the boxes in the photographs contained bill acceptors.  And while the photographs did not show all 400 boxes, there was no evidence that these photographs reflected the entirety of International's inventory at that time.  Indeed, ICT concedes that "it might be reasonable and non-speculative to conclude that the photos did not depict every single box in the warehouse."

ICT then points to testimony from Chang's daughter that her father took these 400 boxes out of the warehouse in July 2016 to argue there was insufficient evidence that the boxes were converted by ICT.  As a preliminary

---

[2] We need not and do not address ICT's additional arguments regarding the sufficiency of evidence related to (1) the $2 million valuation of inventory based on ICT's balance sheet, or (2) International's bank accounts or accounts receivable.  International does not contend that any such evidence supported the jury's damages award here.

11

matter, the testimony from Chang's daughter is not clear on this issue. When asked about the boxes in one of his photographs, she testified: "Those are not the box that my father move out." In any event, it was again reasonable for the jury to credit Chang's testimony that he did not take any inventory from the warehouse on his May or July 2016 visits.

ICT also argues that the evidence on the number of boxes is too speculative because Lin testified that there were "[m]aybe a few hundred" bill acceptors in the warehouse. But this was his estimate of inventory at the time of trial in 2018. The applicable measure of damages is "[t]he value of the property at the time of conversion" in May 2016, when ICT terminated International's purported lease and took over the warehouse. (Civ. Code, § 3336.)

As to the type of bill acceptors, Lin testified that the boxes in Chang's photographs contained the model "A-6" bill acceptors. And as to the number of bill acceptors in each box, Lin estimated that bill acceptors are packed into boxes that are two feet by two feet square. But when shown Chang's photographs, he agreed that the boxes in the photographs were three feet high by two feet wide. He also agreed that the A-6 model unit packed in those boxes would be approximately one foot by one foot in size.

As to the value of the inventory, ICT's invoice showed a sales price for A-6 bill acceptors at $125 each. The invoice was dated April 14, 2016, only a month before ICT's conversion of the inventory. This price was also consistent with Lin's estimate of a $100 to $200 price range for bill acceptors, depending on the model.

ICT argues that this evidence on sales price is not relevant, because it does not show what International paid for the bill acceptors and it is "not reasonable" to assume that the purchase price would be the same as the sales

12

price for a customer.  But the measure of damages is the "market value" of the property at the time of conversion.  (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 756.)  " '[E]vidence of cost is not necessarily evidence of market value.' " (*Stroman v. Lynch* (1949) 91 Cal.App.2d 406, 408 [explaining that cost of merchandise is not conclusive of value, which may be shown by subsequent sale].)

ICT alternatively argues that the customer sales price is not a reasonable measure of damages because International "had lost the right" to distribute products from the family business in Taiwan.  But Chang's daughter testified only that the warehouse would no longer be rented to International after May 2016 because her father (through his Top VME business) was acting as a "competitor" of the family business in Taiwan.  ICT cites no evidence that International would be unable to sell the inventory it already owned at that time.

For all of these reasons, we conclude that the evidence was sufficient to allow the jury to reach a reasonable calculation of damages for conversion of International's inventory.  " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774 (*Sargon*).)  " 'The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.' " (*Ibid.*)  The number of boxes at the warehouse (400), multiplied by the units of inventory per box (average of 10, given one-by-one unit size and either two-by-two foot or two-by-three foot size boxes), multiplied by the sales price ($125 per unit), equals $500,000 in damages.

On the computers, equipment, and furniture, ICT argues that there was insufficient evidence to support the remaining $50,000 in damages. In so doing, it does not contest the jury's finding on conversion of these items. Instead, ICT argues only that the amount should not have exceeded the $35,396 depreciated value reported on International's 2015 tax return. But ICT failed to include this tax return in the appellate record, despite its admission into evidence at trial and the court's ruling that International's tax records supported the $50,000 figure.

A fundamental rule of appellate review is that a judgment of the lower court is " '*presumed correct*' " and to overcome this presumption, the appellant must provide an adequate record to assess any error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) Where the appellant fails to provide an adequate appellate record, their challenge "must be resolved against them." (*Maria P.*, at p. 1296.) We apply this rule here.[3]

We also reject ICT's hypothesis that the only explanation for the total $550,000 damages calculation is that the jury improperly relied on the $550,000 purchase price of the Milpitas house. ICT offers nothing to support this conjecture. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804.) Here, the jury instructions on the elements

---

[3] We note that International purports to attach a single-page document as "Exhibit A" to its respondent's brief that is not in the appellate record. The document is not properly attached and cannot be considered in resolving the appeal. (Rule 8.204(d) [appellate brief may attach exhibits "in the appellate record"]; *Hodge v. Kirkpatrick Development, Inc.* (2005) 130 Cal.App.4th 540, 546, fn. 1 [declining to consider document attached to brief because it was not part of appellate record and violated rule].)

of conversion and damages made clear that the property at issue was "inventory, equipment, customer lists, computers and bank accounts." The special verdict form identified the property in the same way. The answer to the jury's question about "property" during deliberation confirmed this. There is no indication that the jury failed to follow its clear instructions on International's conversion claim.

Nor are we persuaded by ICT's remaining arguments on the denial of its new trial motion. First, ICT contends that the trial court misinterpreted Lin's testimony regarding the amount of inventory as " 'a few hundred' boxes" instead of a few hundred units. As a preliminary matter, Lin did not specify whether he was referring to boxes or units of inventory. When asked to estimate "the quantity of bill acceptors" sitting on the floor of the warehouse, Lin testified: "Maybe a few hundred." In any event, this testimony was elicited as part of a line of questioning about inventory at the time of trial in 2018. This evidence does not compel any conclusion regarding the amount of inventory converted in 2016. (*Fassberg*, *supra*, 152 Cal.App.4th at p. 752.) Instead, the trial court cited relevant testimony from Chang's daughter regarding the "400 boxes" in the warehouse at the end of International's lease. This testimony, along with the photographs and testimony from Chang and Lin, served as a reasonable basis for the quantity of inventory to calculate damages. (*Sargon*, *supra*, 55 Cal.4th at p. 774.)

Second, ICT argues that there was "no evidence" of the $200 unit purchase price used in one of the trial court's calculations, when it multiplied that price by 400 boxes and 6 units per box to reach $480,000 in inventory damages. But Lin testified to an estimated purchase price of $100 to $200, depending on the model of bill acceptor. In any event, the trial court's other calculation used a purchase price of $125, multiplied by 400 boxes and 10

15

units per box, to reach $500,000 in damages for the converted inventory. As we have explained, the $125 price was supported by ICT's April 2016 sales invoice for the same model of bill acceptor and thus served as a reasonable basis for the fair market value of each unit to calculate damages. (*Sargon, supra*, 55 Cal.4th at p. 774.)

In sum, we conclude there was sufficient evidence to support the jury's $550,000 damages award on International's conversion cause of action and the trial court did not err in denying ICT's motion for new trial on this cause of action.

## II. *Prejudgment Interest*

### A. *Additional Background*

In 2024, International moved for prejudgment interest on its damages award pursuant to Civil Code section 3287, subdivision (a) (section 3287(a)).[4] It sought prejudgment interest only from the date of the jury verdict on May 10, 2018. The trial court (Honorable Brad Seligman) granted the motion and entered judgment for International with $222,893.08 in prejudgment interest, calculated from the May 10, 2018 jury verdict date to March 12, 2024 at a 7 percent interest rate.

### B. *Framework and Standard of Review*

Section 3287(a) provides: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." Recovery of prejudgment interest under section 3287(a) is available on a conversion claim. (*Moreno v. Greenwood Auto Center* (2001) 91 Cal.App.4th 201, 210

---

[4] Further statutory references are to the Civil Code.

["The issue then is whether prejudgment interest may be recovered for loss of use and other damages in a conversion action.  We conclude prejudgment interest may be recovered under these circumstances"].)  Absent a statute governing the claim at issue and providing otherwise, the prejudgment interest rate is 7 percent.  (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 573 (*Bullock*), citing Cal. Const. art. XV, § 1.)

The plain language of section 3287(a) requires both certainty and vesting before prejudgment interest can be recovered.  (*Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293–294 (*Watson*) [discussing certainty requirement]; *Leff v. Gunter* (1983) 33 Cal.3d 508, 520 [noting "additional" vesting requirement].)  If these two requirements are met, "the trial court has no discretion—it must award prejudgment interest from the first day there exists both a breach and a liquidated claim."  (*Watson*, at p. 293.)

ICT challenges the first requirement here, arguing that International's damages were not certain or capable of being made certain by calculation to recover prejudgment interest under section 3287(a).  Where, as here, the facts "have been established by findings of the trial court supported by substantial evidence, appellate courts independently review whether and when the plaintiff's damages were made certain or capable of being made certain by calculation."  (*Watson*, *supra*, 2 Cal.App.5th at p. 296.)

### C. *Analysis*

The prejudgment interest issue in this appeal reflects the unusual situation presented here.  International did *not* request prejudgment interest on its damages starting from the date of its injury (the conversion of property) in May 2016.  Nor did it request prejudgment interest starting from the date its complaint was filed in August 2016.  Based on the authority cited

by ICT, such requests appear to be more typical: a plaintiff will seek prejudgment interest from the date of the injury or complaint until the date the judgment is entered. (E.g., *Lineman v. Schmid* (1948) 32 Cal.2d 204, 213 (*Lineman*) [interest from date of breach of contract]; *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 914 (*Chesapeake*) [interest from lease period]; *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 355 [interest from failure to contribute toward insurance fees and costs]; *Iverson v. Spang Industries, Inc.* (1975) 45 Cal.App.3d 303, 311 [interest from costs of repair made to premises]; *Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060, 1062 [interest from date claims became due or date of filing suit]; *Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 226, 240 [interest from date of failure to perform under contract].)

Courts routinely have concluded that prejudgment interest starting from the date of an injury may be available under section 3287(a) if the amount of damages is sufficiently certain at that time. (E.g., *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 920, 928 [reversing denial of prejudgment interest from date of stock purchase because the market value of the shares and the value of the sale proceeds were ascertainable]; *Manley v. Pacific Mill & Timber Co.* (1926) 79 Cal.App. 641, 649 [reversing denial of prejudgment interest from date of performance on lumber contract because "all the items entering into and making up the total sum due from the defendant to the plaintiff existed and the whole amount due was readily ascertainable"].)

But the period of prejudgment interest at issue in this case is different. Here, International sought such interest starting only from the date of the *jury verdict* on May 10, 2018. In other words, its request was limited to the

18

post-verdict, prejudgment period.  Because of the unusual circumstances related to the parties' continued litigation, however, this period lasted six years.

As a preliminary matter, there is nothing in section 3287(a) that categorically prohibits an award of prejudgment interest starting from the date the jury reached a verdict awarding a specific amount of damages to a party.  Any such categorical prohibition would be inconsistent with the purpose of the statute.

Section 3287(a) balances the "tension" between compensating plaintiffs for their losses and maintaining fairness for defendants.  (*Watson*, *supra*, 2 Cal.App.5th at p. 294.)  "Conceptually, prejudgment interest is an element of damages, not a cost of litigation."  (*Id.* at p. 293.)  "From a plaintiff's perspective, prejudgment interest compensates for the loss of the use of the money during the period between the assertion of the claim and the rendition of judgment."  (*Ibid.*)  From a defendant's perspective, section 3287(a) "promotes equity" because it provides for the recovery of prejudgment interest only when there is certainty about the amount owed.  (*Watson*, at p. 293.)

"These competing policy considerations have led the courts to focus on the *defendant's* knowledge about the amount of the plaintiff's claim.  The fact the plaintiff or some omniscient third party knew or could calculate the amount is not sufficient.  The test we glean from prior decisions is: did the *defendant* actually know the amount owed or from reasonably available information could the defendant have computed that amount.  Only if one of those two conditions is met should the court award prejudgment interest."  (*Chesapeake, supra*, 149 Cal.App.3d at p. 907.)

19

Here, we see no basis for International to bear the loss of use of its $550,000 damages award during the six-year period before judgment was entered. (*Watson, supra*, 2 Cal.App.5th at p. 293.) ICT contends that there was some uncertainty on the issue of damages because there was a "substantial difference between the amount of damages alleged in the complaint, sought during trial, and ultimately awarded by the jury." But any such uncertainty was dispelled when the jury reached its verdict on May 10, 2018 and fixed International's damages at $550,000. At that time, ICT knew the amount it owed to International. (*Chesapeake, supra*, 149 Cal.App.3d at p. 907.) Under these circumstances, we conclude that the trial court's award of prejudgment interest under section 3287(a) strikes an appropriate balance between International's loss and ICT's knowledge.

Admittedly, there has been some confusion about the availability of prejudgment interest after a jury verdict based on historical changes to other statutes and the California Rules of Court. Over 50 years ago, Code of Civil Procesure section 1033 *required* the clerk or judge to include " 'any interest on the verdict or decision of the court, from the time it was rendered or made' " in the judgment. (*Dixon Mobile Homes, Inc. v. Walters* (1975) 48 Cal.App.3d 964, 974 (*Dixon*).) When that provision was repealed in the late 1980s, the Judicial Council adopted rule 3.1802. (Judicial Council of Cal., Invitation to Comment, SPR13-12 (2013) Civil Practice and Procedure: Clerk's Addition of Interest to Judgments, pp. 1–2 (SPR13-12).) For the next 30 years, that rule *required* the clerk to add interest accruing from the time of verdict to the judgment. (*Id.* at p. 1.)

California courts thus properly considered requests for prejudgment interest after a jury verdict within this broader framework. In *Dixon*, the cross-complainant was not awarded any interest after receiving a jury verdict

20

for $2,320 in compensatory damages and $2,500 in punitive damages related to a mobile home sales contract. (*Dixon*, *supra*, 48 Cal.App.3d at p. 967.) Applying section 3287(a) along with former section 1033, the appellate court concluded that the cross-complainant was entitled to interest in the period between verdict and judgment. (*Dixon*, at p. 975.) It explained that "the award must bear interest at the legal rate during the period following rendition of the verdict or decision and until entry of judgment." (*Ibid.*)

In *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, the trial court awarded prejudgment interest pursuant to section 3287(a) and former rule 3.1802 after the plaintiffs received a jury verdict for $2,564,348 in compensatory damages related to contamination of their property. (*Holdgrafer*, at pp. 919, 935.) The appellate court affirmed, concluding that the damages were "rendered certain" on the date that the jury's verdict awarding such damages was entered. (*Ibid.*)

Similarly in *Bullock*, the trial court awarded prejudgment interest after the plaintiff received jury verdicts awarding $850,000 in compensatory damages and $13.8 million in punitive damages on her personal injury action. (*Bullock, supra,* 198 Cal.App.4th at pp. 550, 556.) The defendant only appealed the award of prejudgment interest on the punitive damages. (*Id.* at p. 556.) The appellate court affirmed the award, concluding that the damages were sufficiently certain for recovery of prejudgment interest under section 3287(a). (*Bullock,* at p. 574.) It explained: "Damages determined by a verdict are made certain as of the date that the verdict is entered, so prejudgment interest begins to accrue on that date." (*Ibid.*) It then cited former rule 3.1802 , stating that the rule "properly requires" the clerk to include interest accrued since the jury verdict in the judgment. (*Bullock*, at p. 574.)

But in 2014, after these cases were decided, the Judicial Council amended rule 3.1802. (SPR13-12, *supra*, at p. 1.) Rule 3.1802 now reads: "The clerk must include in the judgment any interest awarded by the court." This amendment and the repeal of former Code of Civil Procedure section 1033, removing the *requirements* that the judge or clerk add prejudgment interest from the date of the jury verdict to the judgment, appears to have created some confusion about the remaining availability of such interest.

ICT cites an unpublished federal court decision *Ardestani v. BMW of N. Am. LLC* (C. D. Cal. May 13, 2019) 2019 U.S. Dist. LEXIS 80636. In that case, the jury returned a verdict imposing a civil penalty of $74,000 on the defendant for violation of the Song-Beverly Consumer Warranty Act (§§ 1790 et seq.). (*Ardestani*, at pp. *24-25.) The plaintiff sought $831.23 in pre-judgment interest on the civil penalty for the 41 days between the jury's verdict and the entry of judgment. (*Id.* at p. *23.) The federal court denied the request, explaining that plaintiff had failed to cite "any federal authority for such an award" or "any current California authority in connection with a Song-Beverly Act civil penalty for an award of prejudgment interest between the date of a civil jury verdict and the entry of judgment thereon." (*Ibid.*) The court then noted that rule 3.1802 had been amended. (*Ardestani,* at p. 23.) It therefore declined to apply *Bullock,* as the plaintiffs had requested, because that decision was based "at least in part" on the requirement from the former rule that "no longer governs California court procedure." (*Ardestani*, at p. *23.)

The materials circulated by the Judicial Council in 2014 on the amendment of rule 3.1802 dispel any such confusion. The amendment was intended to address concerns that the former provision *required* the clerk to *automatically* include prejudgment interest from the date of the jury verdict.

22

(SPR13-12, *supra*, at pp. 1–2 [noting language that a clerk "must" include prejudgment interest from the date of the jury verdict, but that an award of such interest "is not automatic"].)  The Judicial Council explained that any such mandate could create ambiguity or inconsistency with the scope of postjudgment interest under Code of Civil Procedure section 685.020. (SPR13-12, at p. 2.)

Most importantly, the Judicial Council explicitly disavowed any interpretation that the amendment to rule 3.1802 foreclosed an award of prejudgment interest from the date of a jury verdict.  It stated: "Eliminating the language from the rule of court would not preclude a court from awarding prejudgment, post-verdict interest in appropriate cases, and would not run afoul of any statutes or case law."  (SPR13-12, *supra*, at p. 2.)  Accordingly, we reject ICT's contention that the amendment left "no basis" for courts to award prejudgment interest from the date of the verdict.  Section 3287(a) still provides a basis for such recovery, if the two requirements of certainty and vesting under the statute are satisfied.  (*Watson*, *supra*, 2 Cal.App.5th at p. 293.)

Our view is not changed by ICT's citation to *Lineman* and its statement that "since the amount of the damages cannot be resolved except by accord, verdict or judgment, interest prior to judgment is not allowable."  (*Lineman*, *supra*, 32 Cal.2d at p. 212.)  *Lineman* arose in a completely different factual and procedural context.  As referenced above, that case involved a request for prejudgment interest starting from the date of a breach of contract to purchase flour, which was denied because of an "absence of established or reasonably ascertainable market prices or values" for flour in the record. (*Ibid.*)  And *Lineman* was decided in 1948, long before the enactment (and

23

subsequent amendment) of a statute and rule of court providing for interest after verdict and before judgment, as we have described.

Nor are we persuaded by ICT's citation to *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515.  In that case, the jury returned a verdict awarding plaintiff $300,000 in damages in May 2005.  (*Id.* at p. 523.)  The trial court "ruled on the equitable claims and confirmed the jury verdict" in July 2005.  (*Id.* at p. 532.)  Judgment was entered in January 2006.  (*Ibid.*)  In that judgment, the trial court used the July 2005 date for the running of interest.  (*Ibid.*)  On appeal, the defendant argued that the interest award violated Code of Civil Procedure section 685.020, subdivision (a), which provides that "interest commences to accrue on a money judgment on the date of entry of the judgment."  The appellate court agreed and modified the judgment. (*Pellegrini* at p. 535.)  But the issue in *Pellegrini* was framed as an award of *postjudgment* interest.  (*Ibid.*)  Nothing in the decision suggests that the plaintiff had requested prejudgment interest under section 3287(a).  Indeed, that statutory provision is not mentioned anywhere.

Finally, we reject ICT's contention that affirming the award of prejudgment interest here "would establish a rule mandating prejudgment interest in every case resolved by jury."  As a preliminary matter, the entitlement to prejudgment interest from the date of a jury verdict under section 3287(a) "does not make an award automatic."  (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 829.)  While it may not need to be explicitly requested in the complaint's prayer for relief, the request "must be made in the trial court."  (*Ibid.*; *Sanders v. City of Los Angeles* (1970) 3 Cal.3d 252, 263.)  Moreover, as the Judicial Council explained, an award of prejudgment interest starting from the date of the jury verdict is available "in appropriate cases."  (SPR13-12, *supra*, at p. 2.)  There may be

circumstances under which a jury verdict does not render damages sufficiently certain or capable of being made certain by calculation for prejudgment interest under section 3287(a). But given the jury verdict fixing International's damages on the conversion claim at $550,000, and the six-year delay in reaching the judgment, such an award is appropriate here.

In sum, we conclude that the trial court did not err in awarding International prejudgment interest from the date of the jury verdict.

## DISPOSITION

The judgment is affirmed. International is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____
Miller, J.

WE CONCUR:

_____
Richman, Acting P. J.

_____
Desautels, J.

A170714, *International Currency Technologies v. ICT, Inc.*

25

Trial Court:  Superior Court of Alameda County

Trial Judge:  Hon. Brad Seligman

Lathrop GPM, Daniel J. Weinberg, Zachary I. Rosenbaum, Allonn E. Levy, for Defendant and Appellant

Law Offices of Michael G. Ackerman, Michael G. Ackerman, for Plaintiff and Respondent

A170714, *International Currency Technologies v. ICT, Inc.*